564 F.2d 1288
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jose Roberto SANUDO-PEREZ, Defendant-Appellant.
 No. 76-3141.
 United States Court of Appeals,
Ninth Circuit.
 Nov. 21, 1977.
Rehearing Denied Jan. 25, 1978.
 
 Glorene Franco (argued), San Diego, Cal., for defendant-appellant.
 Barton C. Sheela, III (argued) on the brief, Terry J. Knoepp, U. S. Atty., San Diego, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of California.
 Before CHAMBERS, KOELSCH and HUFSTEDLER, Circuit Judges.
 HUFSTEDLER, Circuit Judge:
 
 
 1
 Jose Roberto Sanudo-Perez ("Sanudo") appeals from his conviction for conspiracy to possess marihuana. The basic question on appeal is whether Sanudo's incriminating statements to a Drug Enforcement Agency ("DEA") agent were the fruit of an illegal arrest. We conclude that they were, and we accordingly reverse.
 
 
 2
 Two questions must be answered: (1) Was Sanudo illegally arrested? (2) Were the statements tainted by the illegal arrest? We answer both questions affirmatively.
 
 
 3
 The legality of the arrest turns upon the existence of probable cause to sustain the arrest made by Special DEA Agent Pulley. Based on information that Pulley received from some customs inspectors, Pulley undertook surveillance of a grey Monte Carlo in which Salazar, Mata, and Lizarraga were riding on the evening of November 20, 1975. Agent Pulley followed the Monte Carlo from a point near Calexico, but he lost sight of the vehicle in the area where Sanudo lived. At this time, Pulley did not get closer to Sanudo's home than some five or six blocks. About 8:00 p. m. of the same day, Pulley saw a red Chevrolet and followed it until it stopped at a bar. The driver was the sole occupant. He got out of the car and disappeared in a crowd. Pulley inspected the car and found that it was equipped with "air shocks," which led him to suspect that the vehicle was used for transporting contraband.
 
 
 4
 Pulley then returned to the area where he had lost sight of the Monte Carlo. He saw the Monte Carlo again with a trailer attached going north on Highway 88. Agent Pulley directed other agents to stop the Monte Carlo. A strong odor of marihuana was detected, and a large load of marihuana was thereafter discovered. Salazar and Mata were in the vehicle and were arrested. Agent Pulley then undertook to find Lizarraga.
 
 
 5
 Pulley and four agents went to Sanudo's home, hoping to locate Lizarraga. They first went to the wrong house. By the time the agents found Sanudo's home, it was about 10:30 in the evening. Sanudo answered the agents' knock at the door, and the agents told him they were looking for Lizarraga. Agent Pulley testified that Sanudo invited the agents in, the agents looked around and, not finding Lizarraga, they returned to the front porch. Pulley, the only agent who testified, said that he asked Sanudo about Lizarraga and about whether any cars had come into the yard. He said that Sanudo told him that he, Sanudo, had been home all evening, that he had not seen anyone there, nor had any cars come to his house. Pulley then asked Sanudo to come to headquarters, Sanudo agreed, and he was taken to headquarters. At headquarters, Pulley talked to some other agents about activities around Sanudo's residence and then placed Sanudo formally under arrest. After being given Miranda warnings, Sanudo told Pulley that Salazar, Mata, and Lizarraga had driven to his home about 5:00 p. m., and that that trio had transferred marihuana to the trailer. Mata and Salazar then drove away. Agent Pulley also testified that Sanudo told him that he had made arrangements with Lizarraga for the transfer of the marihuana at Sanudo's house earlier that day at a swap meet where Sanudo had a stall.[1]
 
 
 6
 Customs Agent Swanson saw some of the events on the evening of November 20, 1975, from his outpost approximately 300 yards from Sanudo's house. About 7:30 p. m., using binoculars, he saw people moving something between the Chevrolet and the Monte Carlo, but he could not identify the people. He also saw an unidentified person enter Sanudo's house. Sanudo testified that he reached home around 8:30 p. m. that day. Swanson was one of the agents who entered Sanudo's neighbor's home by mistake.
 
 
 7
 The district court initially granted Sanudo's motion to suppress incriminating statements that he made to Agent Pulley, stating, "There was founded suspicion to inquire of him but to arrest him . . . I've got to say he was under arrest . . . " at his home. The following day, however, the court decided that founded suspicion had escalated into probable cause for the arrest of Sanudo at his home because Sanudo had lied about what happened in his conversation with Agent Pulley before Sanudo was taken to headquarters.
 
 
 8
 The Government contends that Sanudo was not arrested at his home, but, on the contrary, voluntarily accompanied Agent Pulley and the other agents to headquarters. The Government, of course, has the burden of proving that Sanudo consented to accompany the agents to the DEA office. Alternatively, the Government argues that even if Sanudo had been arrested at his home, the arrest was based on probable cause and therefore the statements which he gave were not tainted because the arrest was legal. The Government also argues that Sanudo's statement at headquarters was knowingly and voluntarily made after Sanudo was warned of his Miranda rights and his statements, therefore, were admissible. We disagree.
 
 
 9
 We think the record is clear that Sanudo was arrested at his home. To be sure, no talismanic words of arrest were used, but Agent Pulley himself testified that he arrested Sanudo at his home before he took him to headquarters. It is also evident from the record as a whole that Sanudo had no choice, either about leaving the custody of the officers at his home or about accompanying the agents to headquarters. We do not find any basis for a determination of consent on these facts.
 
 
 10
 Viewing the facts retrospectively with respect to what everyone ultimately learned, probable cause could be discerned. But these facts were not put together until after the arrest, and Agent Pulley did not have enough information to justify a finding of probable cause when Sanudo was arrested at his home. We also observe that Agent Pulley could easily have contacted Agent Goff by radio, which was in his car and which was readily available. He himself had been in touch with other agents by this means. It was not necessary to arrest Sanudo and take him to headquarters for this purpose.
 
 
 11
 Moreover, our examination of the record shows that Agent Pulley did not know the suspicious facts to which he later attributed the arrest. Although he testified that he knew that the red Chevrolet had been at Sanudo's home that evening, he had earlier testified that the red Chevrolet had come from the vicinity of Sanudo's home at 8:20 p. m. But at no time in the record did he ever see the red Chevrolet at the Sanudo home. In fact, he himself had never been at Sanudo's home prior to this late evening visit on the date in question. Moreover, he also testified that he had learned from Agent Goff, after taking Sanudo to headquarters, that the Monte Carlo had been at Sanudo's in the evening in question; he was thus unaware of these facts when he arrived at Sanudo's home. The record unmistakably shows that the closest Agent Pulley came to the Sanudo home was five blocks away and from that distance he was unable to see any of the events that had occurred prior to the time he reached Sanudo's home for the purpose of searching Sanudo's house and talking to him.
 
 
 12
 The record is also plain that Agent Pulley did not know at the time he talked to Sanudo that other cars had been at or near the Sanudo residence earlier that evening.
 
 
 13
 The responses by Sanudo to questioning at his home could not have been known by Agent Pulley to be false. The falsity of these statements did not appear until long after the arrest when Sanudo was questioned at headquarters. (Cf. United States v. Portillo Reyes (9th Cir. 1975) 529 F.2d 844; Arnold v. United States (9th Cir. 1967) 382 F.2d 4.)
 
 
 14
 The fact that Sanudo was given Miranda warnings before he made his incriminating statements at the headquarters does not remove the taint. As the Supreme Court said in Brown v. Illinois (1974) 422 U.S. 590, at 602-603, 95 S.Ct. 2254, at 2261, 45 L.Ed.2d 416:
 
 
 15
 "If Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest . . . the effect of the exclusionary rule would be substantially diluted. . . . Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a 'cure-all,' and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to 'a form of words.' "
 
 
 16
 We conclude that the Government did not meet the heavy burden placed upon it to prove that Sanudo's statements were not the product of the illegal arrest at his home on the evening of November 20. Although we consider the evidence in the light most favorable to the Government, the record will nevertheless not support the ruling of the district court.
 
 
 17
 REVERSED.
 
 CHAMBERS, Circuit Judge, dissenting:
 
 18
 The sole question on this appeal is the propriety of the district court's denial of a motion to suppress evidence of incriminating statements made by appellant after his arrest without warrant. The arrest was made at about 11:00 p. m. after a day-long investigation in which Customs Patrol Officers and Drug Enforcement Agency agents collaborated by means of aircraft, automobile and on-foot surveillance; much of the time they communicated with one another by radio.
 
 
 19
 Officers at the Port of Entry noted a car that their computer indicated was owned by a possible narcotics dealer. It was followed to a room at a Calexico motel where the surveillance turned to the occupant and his companions: the co-conspirators Mata, Salazar and Lizarraga. They left the motel and entered a Monte Carlo[1] automobile which was followed in and about Calexico and was eventually fitted with a rental trailer.
 
 
 20
 Agent Pulley entered the surveillance in the early evening when informed by radio to follow the Monte Carlo. He followed it, and its three occupants, to Camacho Road where he lost sight of it about four to five blocks from the Sanudo residence. Other officers, including Customs Patrol Officer Swanson, were in a better position to view the Sanudo residence and Swanson testified that he heard by radio that the Monte Carlo was approaching, he saw it enter the Sanudo premises, and he saw it park at the rear of the residence. He later saw a red Chevrolet arrive there and he saw what appeared to be unloading activity from the Chevrolet to the rear of the Monte Carlo. When the Chevrolet began to leave, he radioed that fact to other officers.
 
 
 21
 Pulley was informed that the Chevrolet was leaving the Sanudo residence and he followed it from the vicinity of the residence to a street in Calexico where it was parked. He examined its exterior and saw that it was empty, that it was riding high, and that it had air shocks. This, in his experience, suggested that it was fit for use as a load car for transporting contraband. He then checked its registration and learned that while it still had California plates, it was registered to a used car dealer in Mexicali, Baja California. To him this was further evidence of its fitness as a load vehicle. He testified that in 75 to 100 narcotics investigations in which he had participated in his four years on duty in the Calexico area, load vehicles had been so licensed and registered.
 
 
 22
 Later that evening Pulley returned to the vicinity of the Sanudo residence where he received radio instructions that the Monte Carlo was leaving. He followed it in his car while customs officers, including Swanson, followed it in separate vehicles. The customs officers (with Pulley in attendance) stopped the car when it entered a highway, arrested Mata and Salazar, the two occupants, searched the trailer and found the marijuana. Lizarraga, who had been with them when they earlier drove to the Sanudo residence, was not present.
 
 
 23
 Pulley, Swanson, and other customs officers, then drove to the Sanudo residence in an attempt to locate Lizarraga.[2] They identified themselves and were permitted to enter by Sanudo, who acknowledged that it was his residence. Then, in response to their questions, he stated that he had been there all evening and that he knew no one named Lizarraga, that no one had been there all evening, and that no cars had been there that evening. Pulley, hearing what he considered to be blatant lies, asked Sanudo to accompany him to the D.E.A. office. The arrest, for our purposes, occurred at this time. After the customary Miranda warnings, Sanudo made the statements that he later sought to suppress.
 
 
 24
 The officers were entitled to search for Lizarraga and to question Sanudo about his whereabouts. From this record it is equally clear that the collective information known to Pulley and Swanson was sufficient to escalate their founded suspicion into probable cause when Sanudo acted evasively by telling the untruths. Implausible and evasive responses to police questioning may constitute probable cause for arrest without warrant. United States v. Mayes, 524 F.2d 803 (9th Cir. 1975); United States v. Richards, 500 F.2d 1025 (9th Cir. 1974).
 
 
 25
 Appellant asks us to make unnatural assumptions that Pulley had no first-hand information that people and cars had indeed been at the Sanudo residence during the day because he admitted that he had not personally seen them at the residence, but only in the vicinity of the residence. The record permits no such assumption. At the trial he testified that when he arrived at the Sanudo residence, immediately prior to the arrest, he "knew that the red vehicle had been there." When asked if he at that time knew that the Monte Carlo had been there, he replied "Yes sir, I did." Evidence adduced at trial may be relied upon to support a district court's ruling on the motion to suppress. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Rocha v. United States, 387 F.2d 1019 (9th Cir. 1967).
 
 
 26
 Moreover, the validity of the arrest in a case such as this is not necessarily limited to what the arresting officer knew as first-hand knowledge. It is sufficient if the surveilling officers collectively had sufficient information upon which a warrant might have been obtained. Williams v. United States, 113 U.S.App.D.C. 371, 308 F.2d 326 (1962); United States v. Bianco, 189 F.2d 716 (3rd Cir. 1951); United States v. Pitt, 382 F.2d 322 (4th Cir. 1967); Moreno-Vallejo v. United States, 414 F.2d 901 (5th Cir. 1969); United States v. Sheppard, 455 F.2d 1081 (10th Cir. 1972). Cf. Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). The collective information shared by agents Pulley and Swanson in this case was more than sufficient to permit this arrest. The motion to suppress was properly denied.
 
 
 
 [1]
 Sanudo's testimony contradicted Agent Pulley's testimony in many respects. Sanudo, among other things, denied many of the statements that Pulley attributed to him. The confession was not reduced to writing, and it was not taped. The district court believed Agent Pulley, and, on appeal, we accordingly accept Agent Pulley's version of the facts
 
 
 [1]
 Throughout the transcript there is reference to the "Monte Carlo" (silver colored) automobile and to the "Chevrolet" (red). We know of no brand name of "Monte Carlo" and assume the reference is to a Chevrolet Monte Carlo model. Herein, when "Monte Carlo" is used, it refers to the silver colored car and when "Chevrolet" is used herein it is to the red car
 
 
 [2]
 At the trial, but not on the motion to suppress, appellant introduced evidence that the officers by mistake first went to Sanudo's next-door neighbor thinking it was all one residence. Although appellant suggests that this is evidence of a lack of founded suspicion to suspect illegal activity at the Sanudo house, the testimony makes it clear that the officers recognized immediately their mistake and went to the Sanudo house to make their inquiries about Lizarraga