UNITED STATES of America, Appellee,

v.

Raymond Eugene JOHNSON, Appellant.

No. 77–3808.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 10, 1978.

Decided Sept. 2, 1980.

John F. Walter, Walter, Finestone & Richter, Los Angeles, Cal., for appellant.

Lourdes G. Baird, Los Angeles, Cal., for appellee.

Before ANDERSON and HUG, Circuit Judges, and EAST *, District Judge.

* Honorable William G. East, United States District Judge for the District of Oregon, sitting by designation.

HUG, Circuit Judge:

Appellant, Raymond Eugene Johnson, was convicted in a jury trial of aiding and abetting the obstruction of correspondence, a violation of 18 U.S.C. § 1703 and 18 U.S.C. § 2. Johnson appeals on the ground that statements made by him on the day of his arrest should have been suppressed for the reason that the arrest was illegal and the statements were products of the illegal arrest and not voluntarily made, and on the further ground that the judge committed error in instructing the jury concerning the voluntariness of appellant's confession. We reverse.

## FACTS

On March 30, 1977, Lena Kearney received by mistake in the mail a letter addressed to Elihu Peterson, containing a United States Treasury check payable to Peterson, in the amount of $4,681.00. Kearney discussed the receipt of this check with her sister-in-law, Wynona Powell, and decided to keep the check and attempt to cash it. Powell then phoned a friend, Joe Dodd, to ask him for assistance in cashing the check. On the following day, Dodd arrived at the Kearney residence with Eugene McCardell and Raymond Johnson, the appellant. The three men seated themselves around a coffee table in Kearney's living room and studied the check. Johnson picked up the check and made a telephone call. During this call he discussed the check and the difficulty of cashing the check because of the age of the payee. Johnson then returned after completing the call and stated that he believed he had someone who could assist them in cashing the check. Dodd, Johnson and McCardell then left the Kearney residence and took the check with them.

Special Agent Richard Hemenway of the United States Secret Service commenced investigating this matter. He interrogated Lena Kearney, who told them that appellant Johnson was one of three men who came to her house for the check and partici-

pated in a general discussion as to how to cash the check. She further stated that Johnson made a telephone call in an attempt to find someone to forge the check. Kearney also identified Johnson from a photo spread as the person who had come to her house. Wynona Powell gave Agent Hemenway appellant Johnson's telephone number, which she stated had been given to her by Dodd as the number at which Dodd could be contacted. Upon checking with the Los Angeles Police Department, Agent Hemenway discovered that Johnson was named in the criminal history files as an associate of Dodd in Dodd's criminal history. Special Agent Hemenway did obtain a warrant for the arrest of Dodd, based on the above and other information obtained through investigation. A warrant for the arrest of Johnson was not obtained.

Special Agent Hemenway and Special Agent William Pickering went to the Johnson house on May 5, 1977, at approximately 6:00 P.M. The agents watched the house for a short period and Agent Pickering saw Johnson's vehicle, with two persons inside, pull up to the driveway of Johnson's house. The two agents then approached the doorway, drew their weapons, pointed them downward and knocked, at first identifying themselves by fictitious names. When Johnson opened the door, Hemenway introduced himself and Pickering as special agents and asked to talk with Johnson. Johnson told the agents to come in. Pickering then stood in the living room with Johnson, while Hemenway looked into the other rooms for other people who might be in the house and present a possible danger to the agents. A woman was discovered during the search and was asked to go into the living room. After Hemenway finished looking into the rooms, which took between 15–30 seconds, he told Pickering that everything was secure. Pickering and Hemenway then returned their weapons to their holsters.

Hemenway then asked Johnson if he would step into the bedroom to talk with him, and Johnson agreed. Before entering the bedroom, Hemenway informed Johnson of his constitutional rights. Johnson re-sponded that he wished to cooperate and then told Hemenway of his involvement in taking the Treasury check. Johnson was then told that he was under arrest. The agents and Johnson left the residence and went to the police station. At the station, Johnson was again advised of his constitutional rights and stated that he understood them. He told Pickering of his involvement with the check while Pickering wrote out the statement. Johnson read the statement, made changes and initialed them. He was placed under oath by Pickering and signed the statement.

### Legality of the Arrest

The two special agents testified that they had not intended to effect an arrest at the time they initially entered the residence of appellant Johnson. It was their belief that an arrest had not occurred until after the interview with Johnson. However, whether an arrest has occurred depends upon an objective, not subjective, evaluation of what a person innocent of a crime would have thought of the situation, given all of the factors involved. When an arrest has occurred depends in each case upon an evaluation of all the surrounding circumstances. Primary among these is a determination of whether or not the defendant was free to choose between terminating or continuing the encounter with the law enforcement officers. *See Sibron v. New York*, 392 U.S. 40, 67, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968); *United States v. Sanudo-Perez*, 564 F.2d 1288, 1290 (9th Cir. 1978); *accord, United States v. Beck*, 598 F.2d 497 (9th Cir. 1979).

From a review of all of the circumstances surrounding the encounter between Johnson and the special agents, we find that appellant's arrest occurred as he stood within his home at the doorway of his home and was first confronted by the agents with their guns drawn. The agents then entered the home with their guns still drawn until the search of the home had been concluded. Johnson was held in the living room while the house was searched. One of the agents

remained with Johnson at all times. It is extremely doubtful that Johnson would have believed that he was free to leave at any time or to request the officers to leave after the initial encounter. A reasonable person, under those circumstances, would have thought that he was under arrest.

■ We must determine whether, even assuming that probable cause existed, the arrest of Johnson in his doorway without first obtaining a warrant violated his Fourth Amendment rights. A warrantless arrest of an individual in a public place upon probable cause does not violate the Fourth Amendment, even though exigent circumstances may not exist. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

In *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), the Supreme Court upheld the warrantless arrest of a defendant who was standing within the frame of her doorway as the officers approached and who then retreated into the vestibule of her home where the officers followed and effected the arrest. The Court held that once the defendant was exposed to public view in her doorway, her act of retreating into her house could not thwart an otherwise proper arrest by officers who pursued her inside. The Ninth Circuit has applied the holding of *Santana* and has upheld the legality of a warrantless arrest of a defendant as he stood in the doorway of his home, *United States v. Botero*, 589 F.2d 430 (9th Cir. 1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979). In that case, Botero, under surveillance by federal officers, was followed to his home. Officers knocked on the front door, which was opened by Botero, and Botero was placed under arrest while he stood in the doorway.

Most recently, in *Payton v. New York*, 445 U.S. 573, 576, 100 S.Ct. 1371, 1375, 63 L.Ed.2d 639 (1980), the Supreme Court held that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." The appeal involved a consolidation of two cases on appeal from the New York Court of Appeals and challenged the constitutionality of a New York statute authorizing police officers to enter a private residence without a warrant and with force, if necessary, to make a routine felony arrest. In each case the police officers, acting with probable cause but without a warrant, had entered the appellant's premises to make an arrest. In the case of appellant Theodore Payton, the officers broke into the appellant's apartment when there was no response to their knock on the door. No one was there, but they seized evidence which was in plain view and which was later admitted in evidence at his trial for murder. In the case of Obie Riddick, the officers knocked on the door of the house where Riddick was living. His three-year-old son opened the door, allowing the officers to see Riddick sitting in bed. They entered the house and placed him under arrest.

The Court held the arrests in both cases to be illegal because of the warrantless nonconsensual entry into the homes of the appellants. The Court emphasized the significance of the boundaries of the dwelling:

But the critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home. The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable Government intrusion." *Silverman v. United States*, 365 U.S. 505, 511, [81 S.Ct. 679, 682, 5 L.Ed.2d 734]. In

terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

445 U.S. at 589–590, 100 S.Ct. at 1381–82.

This case can be distinguished from both *Santana* and *Botero*. In *Santana* the suspect was in full view in the doorway as the officers approached. In *Botero* there was no subterfuge in getting the suspect to open the door; furthermore, exigent circumstances existed. In contrast, Johnson opened the door of his dwelling after the agents misrepresented their identities; thus, Johnson's initial exposure to the view and the physical control of the agents was not consensual on his part. *Cf. Payton*, 445 U.S. at 583, 100 S.Ct. at 1378 (entries were similarly nonconsensual). Moreover, Johnson's invitation to the agents to enter after the door was opened was hardly voluntary in light of the coercive effect of the weapons brandished by the agents.

This case, on the other hand, differs from both of the situations addressed in *Payton*. The illegal search of Payton's home and the illegal arrest of Riddick did not occur until the police had entered the suspect's homes. 445 U.S. at 573–579, 100 S.Ct. at 1374–76. In this case, we are confronted with the situation where the suspect was arrested as he stood inside his home and the officers stood outside his home with drawn weapons. In these circumstances, it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home. Otherwise, arresting officers could avoid illegal "entry" into a home simply by remaining outside the doorway and controlling the movements of suspects within through the use of weapons that greatly extend the "reach" of the arresting officers.

The *Payton* decision held that in the case of Obie Riddick the warrantless entry of the Riddick's home by police officers to arrest Riddick was not justified when his three-year-old son opened the door and they could see him sitting in bed. We doubt the Supreme Court would have reached a different result had the police stood at the doorway and immediately placed Riddick under arrest with weapons drawn.

■ This case rather closely parallels that of the *Riddick* case discussed in *Payton*. Riddick did not voluntarily expose himself to warrantless arrest by the police as in a public place by allowing his three-year-old son to open the door of his home. Similarly, it cannot be said that Johnson voluntarily exposed himself to warrantless arrest by opening his door to agents who misrepresented their identities. In light of the strong language by the Court in *Payton* emphasizing the special protection the Constitution affords to individuals within their homes, we find that the warrantless arrest of Johnson, while he stood within his home, after having opened the door in response to false identification by the agents, constituted a violation of his Fourth Amendment rights.

### Fruits of the Arrest

The final question is whether the statements made by Johnson after his arrest were fruits of the unlawful arrest. The first statement was given by Johnson in his bedroom after he had been given his *Miranda* warnings but before he was formally told he was under arrest. In that statement, he admitted his involvement in taking the Treasury check. After having been placed formally under arrest he was taken to the police station where he was again given a *Miranda* warning before he signed a similar written statement under oath.

In *Brown v. Illinois*, 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975) the Supreme Court held that "*Miranda* warnings, *alone* and *per se*, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession."

■ Therefore, a determination that statements made after *Miranda* warnings

were "voluntary" for purposes of the Fifth Amendment merely meets the "threshold requirement" for Fourth Amendment analysis. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1980); *United States v. Perez-Esparza*, 609 F.2d 1284, 1288 (9th Cir. 1980).

The Court in *Dunaway* elaborated on the *Brown* doctrine stating:

> *Brown* articulated a test designed to vindicate the "distinct policies and interests of the Fourth Amendment." Following *Wong Sun* [*v. U. S.*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441], the court eschewed any *per se* or "but for" rule, and identified the relevant inquiry as "whether Brown's statements were obtained by exploitation of the illegality of his arrest." *Brown's* focus on "the causal connection between the illegality and the confession," reflected the two policies behind the use of the exclusionary rule to effectuate the Fourth Amendment. When there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts.

*Dunaway*, 99 S.Ct. at 2259 (citations omitted).

The three factors identified in *Brown* in determining whether the statements were obtained by exploitation of an illegal arrest were:

(1) the temporal proximity of the statements and the arrest;

(2) the presence of any intervening circumstances; and,

(3) the purpose and flagrancy of the official misconduct.

*Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62. The focus of these factors as emphasized in *Dunaway* is the "causal connection" between the illegal detention. The first two factors, "temporal proximity" and "the presence of intervening circumstances," clearly pertain to the determination of whether the defendant supplied the evidence of his own free will, apart from any compulsion caused by the illegal detention. The attenuation which we analyze is the degree of causal remoteness between the illegal detention and the evidence obtained from the defendant.

The third factor, "the purpose and flagrancy of the official misconduct," could arguably be viewed as a broad general factor utilized to assess whether the flagrancy of police misconduct justifies the exclusion of the evidence in light of the deterrence rationale of the exclusionary rule. *See Dunaway*, 99 S.Ct. at 2263 (dissenting opinion of Rehnquist, J.), *Perez-Esparza*, 609 F.2d at 1289–91.

However, the Court appears instead, to apply the third factor along with the first two factors in determining the degree of causal remoteness. Justice Stevens in his concurring opinion in *Dunaway* stresses this point, stating:

> The flagrancy of the official misconduct is relevant, in my judgment, only insofar as it has a tendency to motivate the defendant. . . . [I]f the Fourth Amendment is violated, the admissibility question will turn on the causal relationship between the violation and the defendant's subsequent confession.

*Dunaway*, 99 S.Ct. at 2260 (citations also omitted). The majority opinion in *Dunaway* repeatedly emphasizes that it is the "causal connection" that is the relevant inquiry in making the attenuation determination. The majority opinion affords only brief consideration to the "purpose and flagrancy" factor in that case. A reasonable explanation is that the close causal connection between the illegal detention and the evidence obtained from defendant Dunaway was apparent from consideration of the temporal proximity and the lack of intervening circumstances, even though the conduct of the police was not especially flagrant.

The statement of Johnson given to Agent Hemenway in his bedroom, in which he admitted his involvement in taking the Treasury check, was made within ten minutes after the entry and, as in *Dunaway*,

"[n]o intervening events broke the connection between petitioner's illegal detention and the confession." *Dunaway*, 99 S.Ct. at 2260. The later statement at the police station was substantially in accord with his earlier statement. This later statement was clearly the result and fruit of the first. *See Brown*, 422 U.S. at 605, 95 S.Ct. at 2262. Having given one statement which inculpated him in the crime, he had already committed himself; there was little incentive to withhold a repetition of it. He had been advised that the first statement could be used against him, and thus, the second statement confirming the first has a close causal connection to the first. The second statement was given within an hour or two of the first and there were no intervening circumstances of significance other than being given an additional *Miranda* warning at the station.[1] The first two *Brown* factors clearly indicate that the causal relationship between the illegal arrest and the incriminating statements was so close as to require the conclusion that Johnson's statements were "obtained by exploitation of the illegality of his arrest," *Dunaway*, 99 S.Ct. at 2259.

■ The third factor, "the purpose and flagrancy of the police misconduct" could be particularly important in some cases in influencing the suspect to make statements after an illegal arrest. However, in this instance, as in *Dunaway*, it was not. The close causal relationship between the illegal arrest and the statements established by the first two factors require the conclusion that Johnson's statements were "obtained by exploitation of the illegality of his arrest," *Dunaway*, 99 S.Ct. at 2259. Therefore, the statements should have been suppressed, and we reverse on that ground; we need not consider the remaining grounds for appeal.

REVERSED.

1. The Government argues that Johnson was permitted to drive his own automobile to the police station. Thus, Johnson did have a brief time away from the agents, but he went directly to the station, he did not consult an attorney or anyone else, and he was keenly aware that he had just admitted his involvement in the crime. He was not free to leave, but was required to go directly to the police station. Thus, he was not free from police influence for any significant period as in *Wong Sun*.