**UNITED STATES of America, Plaintiff,**

v.

**Daniel Jay OSTIN, Defendant.**

**No. CR–94–126–JLQ.**

United States District Court,
E.D. Washington.

July 26, 1994.

Jane M. Kirk, Asst. U.S. Atty., Yakima, WA, for plaintiff.

Jane Greek, Federal Defenders of Eastern Washington, Spokane, WA, for defendant.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

QUACKENBUSH, Chief Judge.

**BEFORE THE COURT** is Defendant's Motion to Suppress Evidence, heard on July 14, 1994. Assistant United States Attorney Jane M. Kirk represented Plaintiff. Defendant did not appear, but was represented by his court-appointed attorney, Assistant Federal Defender Jane Greek. All of the material facts are undisputed, and no evidentiary hearing was requested. Having reviewed the record, heard from counsel, and being fully advised in this matter, **IT IS HEREBY ORDERED** that Defendant's Motion for Suppression of Evidence is **DENIED** for the following reasons.

### FACTUAL BACKGROUND

At approximately 6:10 p.m. on May 28, 1994, a man entered a branch of the Washington Mutual Bank in Rosauer's Grocery Store on 29th Avenue in Spokane, Washington. He went to the customer table in the lobby, where it appeared he was filling out a deposit slip. He then approached a teller, and gave her a withdrawal slip that read "Give me all your money." She put approximately $1,004.00 in a bag, and the robber left the bank. When police arrived to investigate they were given a general description of the robber as approximately five feet nine or ten inches tall, medium weight, black and gray hair, clean shaven, and wearing a tan jacket.

At 11:00 that night, the Spokane Police Department received a call from a concerned citizen who said he had some information regarding the bank robbery. Officers responded at approximately 12:30 a.m. on May 29, 1994 and spoke with Jeff Wells. Wells told the police that he and two friends had been at the Playfair horse races earlier that day. Mr. Wells only knew these men by their first names, Dan and Chuck. Dan was later identified as the Defendant, Daniel J. Ostin. Wells said that Ostin had lost all of his money, as well as $20.00 borrowed from Mr. Wells, betting on the races. Mr. Ostin then asked Chuck to take Mr. Wells and him to a bank to withdraw some money. The

three men left Playfair at approximately 5:30 p.m., and drove to Rosauer's Store on 29th Avenue. When they arrived at Rosauer's, Mr. Ostin went in while the other two men remained in the truck. When Ostin emerged from the store he told the driver to hurry because he had stolen some cigarettes and was in trouble.

The three men proceeded to a tavern at 57th and Regal. There, Mr. Ostin gave Mr. Wells a $50.00 bill. The three stayed and drank beer for a few hours. During this time, Mr. Ostin told Mr. Wells and Chuck that he had robbed a bank. Mr. Wells was not sure he believed him, but noted that Mr. Ostin paid for all of the beer with cash. Between 8:30 and 9:00 p.m. the three left the tavern, and Chuck dropped Mr. Wells and Mr. Ostin off at Cavanaughs Inn at 4th Avenue and Cowley. Mr. Ostin rented room 207, paying cash, and then went out again. Mr. Wells rented another room, became more suspicious as he thought about the day's events, and eventually called the police to report his suspicions that Mr. Ostin had robbed a bank. The police went to Cavanaughs Inn and discovered that Mr. Ostin was not in his room. However, motel personnel said they would notify the police when Ostin returned to his room.

At approximately 2:00 a.m. on May 29, 1994, a motel clerk notified the police that Ostin had returned to his room at Cavanaughs Inn. Officers E. Olson and B. Estes accompanied Officer Wuthrich to Room 207. Officer Estes knocked at the door, and Mr. Ostin opened it. The officers noted that Mr. Ostin matched the description of the bank robber, and Officer Estes told him to place his hands on top of his head and to turn around where he was standing in the motel doorway.

The officers' reports indicate that Mr. Ostin immediately began to move his right arm, and reach into the bathroom area to his right. Mr. Ostin was yelled at, at least twice, to place his hands on his head, and he refused to do so. Officer Estes then grabbed Mr. Ostin, pulled him away from the bathroom door, and held him against a wall until Officer Wuthrich could handcuff him. At this point, the officers had clearly gone be-yond the doorway, and had entered the motel room without a warrant. However, it is undisputed that Mr. Ostin had been arrested at the door, and everything that occurred thereafter was incident to that arrest.

The officers then read Ostin his *Miranda* rights. He said he didn't understand, and the rights were re-read to him. He then said he wanted to waive his rights, and tell "his side of the story". The handcuffs were then removed, and Mr. Ostin gave the officers permission to search his pants pockets. Defendant had $13.00 and a deposit slip reading "Give me all your money" in his pocket. At that point Mr. Ostin confessed to the robbery. A subsequent search produced $661.00 in cash from Ostin's wallet. Defendant contends that pursuant to *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1989), the police made an illegal warrantless arrest at the doorway of his motel room.

## DISCUSSION

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their ... houses ... shall not be violated." Prior to April 15, 1980, it was commonly sanctioned behavior for the police to enter a person's home, if they had probable cause to arrest, but did not have an arrest warrant, in order to effect the arrest. On April 15, 1980, the Supreme Court held that, absent exigent circumstances, a police officer entering a person's home to make a felony arrest without a warrant violates the Fourth Amendment, and that the same analysis applies to the warrantless arrest in a person's home as to a warrantless search of a person's home. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990), the Court reiterated the *Payton* holding, finding that an admittedly non-consensual warrantless entry and arrest of the defendant in his home violated the Fourth Amendment. Therefore, any analysis of whether police officers have violated the Fourth Amendment by engaging in a warrantless search or seizure in a person's

home must be guided by *Payton*. It is Defendant's contention that the warrantless arrest in this case was unconstitutional under *Payton*. However, this case is factually distinguishable from *Payton*, in that here, the warrantless arrest did not occur within the Defendant's home. Rather, it occurred at a motel, and it occurred not inside a motel room, but in the open doorway of the room, the door having been voluntarily opened by the Defendant.

■ It is well settled, and not disputed, that Fourth Amendment protections apply to the registered occupant of a hotel or motel room. *Hoffa v. United States*, 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966); *United States v. Holzman*, 871 F.2d 1496 (9th Cir.1989). A warrantless non-consensual arrest in a non-public place such as a home or motel room is presumptively unreasonable and violative of the Fourth Amendment. *United States v. Alvarez*, 810 F.2d 879, 881 (9th Cir.1987). By its nature, a hotel affords its occupants lesser privacy expectations than does a house. One staying at a hotel or motel expects limited intrusions of privacy to turn down the bed, clean the room, etc. Nevertheless, a motel room is a place where the occupant has a strong and legitimate expectation of privacy. *United States v. Winsor*, 816 F.2d 1394, 1399 (9th Cir.1987). Therefore, the court is satisfied that had the officers broken down the door to enter the motel room, or commanded the opening of the door, or somehow else gained a non-consensual entry in order to effect a warrantless arrest of Mr. Ostin, they would have violated his Fourth Amendment rights under *Payton*. However, that is not what happened here.

■ The Fourth Amendment protects people, not places. The Supreme Court has stated that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Therefore, a warrantless arrest of a suspect made in a public place upon probable cause does not violate the Fourth Amendment, even though exigent circumstances do not exist. *United States v. Watson*, 423 U.S.

411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *United States v. Hoyos*, 892 F.2d 1387 (9th Cir.1989), *cert. denied*, 498 U.S. 825, 111 S.Ct. 80, 112 L.Ed.2d 52 (1990). Clearly, when a person is in a public place, he has no legitimate expectation of privacy.

■ Here, it is undisputed that Mr. Ostin was arrested as he stood within the doorway of the motel room, and that the officers had probable cause to arrest him. It is also undisputed that the officers did not have an arrest warrant, and that no exigent circumstances existed at the time of the arrest. Therefore, the resolution of this motion must revolve around whether the arrest of Mr. Ostin was valid because he had voluntarily exposed himself to public view at the time of his arrest, and/or because he voluntarily consented to opening the motel room door, thus foregoing the right of privacy he was entitled to in the motel room.

In *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), the Supreme Court upheld the warrantless arrest of a defendant who was standing within the frame of her doorway as the officers approached, and who then retreated into her home where the officers followed and effected the arrest. The Court held that once the defendant was exposed to public view in her doorway, her act of retreating into her house could not thwart an otherwise proper arrest by officers who pursued her inside. The Ninth Circuit applied the *Santana* holding in *United States v. Botero*, 589 F.2d 430 (9th Cir.1978) *cert. denied*, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979). In that case, Botero was under surveillance by federal officers, and was followed to his home. Officers knocked on the front door, which was opened by Botero, and Botero was placed under arrest while he stood in the doorway. *Santana* and *Botero* both predated the Supreme Court decision in *Payton*. However, even after *Payton*, courts have continued to recognize that an open door may constitute at least a partial forfeiture of a person's complete right to privacy.

In *United States v. Johnson*, 626 F.2d 753, 757 (9th Cir.1980), *aff'd*, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), the agents

conducting an investigation went to Johnson's house, and approached the front door with their weapons drawn. The officers knocked and falsely identified themselves. Once Johnson opened the door, they correctly identified themselves and asked to talk with Johnson, who told the agents to come in, which they did. The agents subsequently conducted a search, and arrested Johnson.

The court first found that the arrest had occurred when Johnson opened the door, and was confronted by the agents with their guns drawn. The court then addressed the issue of whether "even assuming that probable cause existed, the arrest of Johnson in his doorway without first obtaining a warrant violated his Fourth Amendment rights." *Id.,* 626 F.2d at 756. The court found that, unlike *Santana* and *Botero,* Johnson's initial exposure to the view and physical control of the agents was not consensual because the agents had misidentified their identities in order to get Johnson to open the door.

It is Mr. Ostin's position that because the officers here did not identify themselves at all, but merely knocked on the door, it is analogous to the misidentification in *Johnson.* The court disagrees.

In *United States v. Winsor,* 846 F.2d 1569 (9th Cir.1988), **(en banc)** the defendant argued that the police effected a non-consensual search of the room when they knocked on the door and commanded that it be opened under claim of lawful authority. The court agreed, and then turned to the question of "the appropriate level of suspicion constitutionally required to justify such a search." *Id.* at 1573. The court noted that *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) established a bright line rule that a warrantless dwelling-place search as well as a dwelling-place seizure requires probable cause. The court therefore found that the defendant's Fourth Amendment rights had been violated, because at the time the police knocked on his hotel room door, they had reasonable suspicion to believe that the suspected bank robber was inside, but did not have probable cause to believe so.

In *United States v. Shaibu,* 920 F.2d 1423 (9th Cir.1990), the police officers went to Shaibu's apartment complex without a warrant, and without probable cause that Shaibu had committed a crime. They were looking for someone else. The apartment complex had a front gate and buzzer system, and the officers rang the buzzer to Shaibu's apartment. Shaibu asked who was there. The officers did not respond, the gate release sounded, and the officers entered the complex. Shaibu exited his apartment into the hallway, leaving his apartment door open, and encountered the officers in the hallway. The police then identified themselves, and asked if the suspect was in Shaibu's apartment. Shaibu did not respond, walked back into the apartment, leaving the door open, and the detectives followed him inside. Shaibu did not ask the officers to wait outside, leave, or produce a warrant. The officers did not ask permission to enter the apartment nor state their intention to do so, but simply followed Shaibu through the open door.

The court rejected the Government's contention that Shaibu had impliedly consented to the entry into his apartment. The court noted that "in 'knock notice' cases when the police have a legal prerogative, such as a warrant or probable cause, an open door has sometimes been construed as reducing the police's obligation to announce themselves and request entry before 'breaking the door' of a dwelling." *Id.* at 1427. However, "there is no legal grounds to enter the home without explicit request when they infer consent from mere acquiescence." *Id.* "We hold that in the absence of a specific request by police for permission to enter a home, a defendant's failure to object to such entry is not sufficient to establish free and voluntary consent. We will not infer both the request and the consent." *Id.* at 1428.

In *United States v. Hoyos,* 892 F.2d 1387 (9th Cir.1989), *cert. denied,* 498 U.S. 825, 111 S.Ct. 80, 112 L.Ed.2d 52 (1990), the defendant was arrested in his backyard at the back door of his home. He contended that even if the officers had probable cause to arrest him, the arrest violated his Fourth Amendment rights because the officers arrested him in a non-public place without a warrant. The court held that defendant was in a public place at the time of the arrest, and that the arrest was therefore valid.

Moreover, this was not a situation where the officers coerced or engaged in subterfuge to get Hoyos or the others into the yard. (citing *Johnson.*) Hoyos was under arrest from the time Deputy Love instructed him to stop. At that time Hoyos was looking out and over his fence exposing himself to public view of anyone on the street. Thus, Hoyos was in a "public place."

*Id.,* 892 F.2d at 1394.

The most recent case on the issue is *United States v. Garcia,* 997 F.2d 1273 (9th Cir. 1993). There, the police officers were conducting surveillance of an apartment complex based on a tip that narcotics were being sold there. The officers, who did not have a warrant, posed as prospective renters looking for an apartment, and looked through a closed screen door and open glass slider into the apartment, while they asked an occupant questions about rent and the neighborhood. One of the detectives asked another occupant, Garcia, to throw away an empty soda pop bottle he had in his hand. When Garcia opened the door to take the bottle, the officers grabbed the door to keep it from closing, flashed their badges and said they would like to talk to Garcia. Garcia said "okay", nodded his head, and stepped back into the apartment. The agents entered the apartment, pushed Garcia against a wall, and conducted a sweep search of the apartment. The district court denied Garcia's Motion to Suppress Evidence.

The first issue before the circuit was whether the officers conducted a Fourth Amendment search of Garcia's residence by looking into the apartment. The court found that by standing on the back porch of the apartment, and looking through the mesh screen door, the officers did not make an unlawful entry or conduct an unlawful search in violation of the Fourth Amendment. Next the court determined that the officers' use of a ruse to obtain evidence that was in plain view was not a violation of the Fourth Amendment. The court then addressed the issue of whether Garcia's warrantless arrest was proper. Garcia argued that his arrest was illegal because the officers entered his apartment without a search warrant, in violation of the Fourth Amendment under *Payton.* The district court had found that an exception to the warrant requirement applied, in that Garcia had consented to the officer's entry.

The circuit found that, unlike *Shaibu,* consent to enter could be inferred from Garcia's step back to continue his conversation with officers who were then outside the door, and then addressed the issue of whether that consent was voluntary. First the court found that the officers did not obtain consent involuntarily through their ruse of posing as renters, because that ruse had ended by the time Garcia gave consent. Next, the court found that the agents' trickery in getting Garcia to open the door did not render his consent involuntary. Finally, the court rejected Garcia's contention that his warrantless arrest was invalid, due to the lack of probable cause.

Here, it is undisputed that the police had probable cause, but no warrant to arrest Mr. Ostin, and that the warrantless arrest was made in the doorway of the motel room, as Mr. Ostin voluntarily opened the door, and before the officers entered the room. There is no contention that the officers identified themselves, misidentified themselves, demanded the opening of the door, or tricked or coerced the Defendant in any way to open the door. They had probable cause to arrest Mr. Ostin, had probable cause to know he was in the motel room, and knocked on the door. Mr. Ostin voluntarily opened the door, exposing himself to public view of anyone who happened to be in the area, thus no longer being in an area where he had any expectation of privacy, because he was exposed to public view, speech, hearing, and touch, as if he had been standing completely outside of the motel room, as was the case in *Hoyos, supra.*

Neither of the parties have cited a case directly on point, and the court has found no controlling law that has directly addressed the issue before this court. However, the court finds the court's resolution of this issue in *United States v. Carrion,* 809 F.2d 1120 (5th Cir.1987) to be well reasoned. In that case, the defendant, like the Defendant here, was arrested immediately after opening the

door to his hotel room in response to a knock. The court noted the *Payton* rule, and that the same requirement applies to guest rooms in commercial establishments, but found that the defendant's arrest was not in violation of the *Payton* requirement because:

> the arrest was effected before the agents entered Solmor's hotel room and Solmor had no protectible expectation of privacy at the time the arrest was effected. When agents went to Solmor's room they had probable cause to arrest, their investigation had focussed on Solmor, and it was their subjective intent to arrest him ... Thus, Solmor's arrest occurred as he stood in the doorway of his hotel room and was first confronted by agents ..., who were standing in the hallway ... Solmor had no protectible expectation of privacy at the open door to his hotel room.

*Id.* at 1128. Here, as there, the arrest of Mr. Ostin was effected before the officers entered the motel room, and Mr. Ostin had no protectible expectation of privacy at the time the arrest was effected. When the officers went to Ostin's room, they had probable cause to arrest him, their investigation had focused on him, and it was their subjective intent to arrest him. Mr. Ostin's arrest occurred as he stood in the doorway of his hotel room and was first confronted by the officers, who were standing in the hallway. Mr. Ostin had no protectible expectation of privacy at the open door to his motel room. Therefore, the court concludes that the arrest of Mr. Ostin was valid. Accordingly, Defendant's Motion to Suppress Evidence based on an illegal arrest is **HEREBY DENIED.**

**IT IS SO ORDERED.**