# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STEVEN FISHER,
　　　　　*Plaintiff-Appellee,*
　　and

SANDRA FISHER,
　　　　　*Plaintiff,*

　　　v.

CITY OF SAN JOSE,
　　　　　*Defendant-Appellant,*
　　and

CITY OF SAN JOSE POLICE
DEPARTMENT; OFFICER BOLER;
OFFICER BARNETT; OFFICER CORREA;
OFFICER ESQUIVEL; OFFICER HONDA;
OFFICER KINSWORTHY; OFFICER
O'BRIEN; OFFICER RYAN; OFFICER
NGUYEN,
　　　　　*Defendants.*

No. 04-16095

D.C. No.
CV-01-21192-PVT

OPINION

Appeal from the United States District Court
for the Northern District of California
Patricia V. Trumbull, Magistrate Judge, Presiding

Argued and Submitted
April 5, 2006—San Francisco, California

Filed January 16, 2007

Before: David R. Thompson, Marsha S. Berzon, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Berzon;
Dissent by Judge Callahan

465

## COUNSEL

Clifford S. Greenberg, Senior Deputy City Attorney, San Jose, California, for defendant-appellant City of San Jose.

Donald E.J. Kilmer, Jr., San Jose, California, for plaintiff-appellee Steven Fisher.

## OPINION

BERZON, Circuit Judge:

Steven Fisher claims constitutional violations stemming from a twelve-hour standoff at his apartment between him and a large number of San Jose police officers, at the end of which he came out of the apartment and submitted to arrest. He sued the city of San Jose (the City) and several officers under 42 U.S.C. § 1983, contending, among other things, that the arrest was invalid because the police never obtained or attempted to obtain a warrant. A jury found for the defendants on all claims, including a claim for warrantless arrest. Fisher thereupon filed a renewed motion under Federal Rule of Civil Procedure 50(b) for judgment as a matter of law on the warrantless arrest claim. Granting the motion against the City alone, the district court ordered the City to pay nominal damages of one dollar and issued an injunction regarding future training of police officers. We uphold the district court's ruling on appeal, as we agree that the failure to obtain a warrant under the unusual circumstances of this case constituted a constitutional violation as a matter of law.

## I.  Background

### A.  The Standoff

On the afternoon of Saturday, October 23, 1999, Fisher bought two twelve-packs of beer and settled in at home for an evening of watching the World Series and cleaning rifles from his collection of approximately eighteen World War II-era firearms. Both the guns and the beer figured prominently in the ensuing events.

Those events began when, around midnight, Leo Serrano, a security guard at Fisher's apartment complex, was walking near Fisher's apartment investigating noise complaints regarding Fisher's upstairs neighbor. Fisher's apartment is on the bottom floor of the apartment complex and has a sliding glass door leading out to an enclosed patio; passers-by can see into the apartment through the glass door. Noticing Fisher in his apartment, Serrano motioned for him to come outside and speak with him. Fisher walked out, carrying the rifle he had been cleaning when Serrano called to him.

When Serrano asked Fisher about the noise coming from his upstairs neighbor, Fisher was generally unresponsive, eventually changing the subject to the Second Amendment. Throughout the short conversation, Fisher held his rifle in various positions. Whether Fisher pointed the rifle at Serrano is not clear: At trial, Serrano testified that Fisher did not, but an officer who had been called to the scene after Serrano testified at trial that when he arrived at Fisher's apartment complex, Serrano told him that Fisher had pointed the rifle toward him during the initial encounter. Either way, Serrano suspected that Fisher was intoxicated and, feeling uncomfortable and frightened in Fisher's presence because of the liquor, the gun, and the odd reaction to Serrano's questions, left to tell his supervisor about his interaction with Fisher. The supervisor notified the police, who responded by sending officers to the scene.

Sergeant Ryan was among the first to arrive, at around 2 a.m. After speaking with Serrano, Ryan approached Fisher's patio and attempted to get Fisher's attention by throwing small rocks at the sliding glass doors. Fisher came to the door but, rather than answering Ryan's questions, spoke in a rambling fashion of his Second Amendment rights. Ryan, too, believed that Fisher was intoxicated.

After Ryan tried to speak with Fisher, more police officers began arriving at the scene; eventually, over sixty officers participated in the standoff. Early on, some officers telephoned Fisher's apartment. When Fisher's wife, Sandra, answered the phone, the officers instructed her to leave the apartment, which she did. It is not clear whether she put the phone back on the hook, but it was busy throughout the remainder of the standoff. When she emerged, Sandra informed the police that no one else was inside the apartment. She also confirmed that Fisher had eighteen rifles in the apartment and had been drinking.

At approximately 3 or 4 a.m., Jan Males, a tactical negotiator, arrived and tried to communicate with Fisher. Unprompted, Fisher informed Males that he had a right to bear arms. He invited her into his apartment but said he would shoot her if she did come in. Males considered this statement to be a criminal threat, a felony.

Aside from that interaction, throughout the early morning Fisher repeatedly told the police to "go away, leave me alone, and don't bother me." Twice during that period, Officer Boler, who was observing the apartment from across the street, reported that Fisher was pointing one of his rifles at Ryan and Males, who were the officers closest to Fisher's apartment and were sheltering themselves behind a tree. Boler also reported that Fisher was moving the rifles around his apartment. Despite these observations and the threat to Males, no officer told Fisher during those early morning hours that he was under arrest.

Fisher was last seen with a rifle at approximately 6:30 a.m. A little while later, at around 7 a.m., the Mobile Emergency Response Group and Equipment (MERGE) team came to the scene, replacing the patrol officers who had first arrived.[1] At that point, believing that Fisher had committed a crime — pointing a rifle at police officers — the MERGE team focused its efforts on forcing him out of his apartment to arrest him. The officers had Fisher's power turned off at 8:48 a.m. and then broke the sliding glass doors so a "throw phone"[2] could be tossed through, as Fisher's phone remained busy. At 10:52 a.m., the police set off a "flash-bang" device, designed to get Fisher's attention and disorient him briefly. Two hours later the police began throwing CS gas canisters into Fisher's apartment; CS gas causes irritation and burning sensations. One of the CS gas volleys sent glass flying, cutting Fisher's forehead above one eye.

At 2 p.m., the police again attempted to contact Fisher, this time by bullhorn. They finally achieved telephone contact, via the throw phone, at 2:13 p.m. Fisher stated at that point that he was willing to leave his apartment and offered to leave naked so that the police would not suspect him of carrying a weapon. When the police told him that this was not necessary, he said that he would come out in his boxers and socks. The police approved this plan.

Fisher emerged from his apartment at 2:35 p.m. He initially followed police instructions, walking in the designated direction and keeping his hands in the air. Soon, however, he stopped walking forward. One of the officers thereupon shot him in the leg with a "sage gun," which shoots less-than-lethal rubber bullets. Fisher then lay down on the ground, and the officers handcuffed him and took him into custody.

---

[1]The MERGE team was called at 4:45 a.m.

[2]A throw phone is a phone encased in a box that also contains an open microphone.

Several of the police officers involved in the first shift returned to the police station after they left in the morning and wrote police reports; some of those officers testified that they had intended to arrest Fisher. All the police officers who were asked at Fisher's § 1983 trial whether they attempted to procure a warrant said no, including some of those who returned to the station in the morning. Also, all of the officers who were asked testified that they did not believe a warrant was necessary. Finally, all of the officers who were asked testified that they knew that judges are available twenty-four hours a day to issue warrants.

Fisher was tried for felony violations of California Penal Code sections 417 and 417.8, which prohibit, in general, drawing, exhibiting, or using a firearm or deadly weapon against a peace officer or with the intent to resist or prevent an arrest. The jury deadlocked, and Fisher then pleaded no contest to a misdemeanor charge of brandishing a firearm in the presence of a security officer.

## B.　**The Lawsuit**

Fisher and his wife sued the city of San Jose, the San Jose Police Department, and several San Jose police officers. They alleged, among other causes of action (1) that Fisher's warrantless arrest was an unreasonable seizure; and (2) that the use of the sage gun and of the CS gas constituted state law batteries. The basis for the claim against the City was that it was "either jointly and severally liable; *and/or* vicariously liable through the doctrine of *respondeat superior* for the actions of its employee police officers also named herein in their individual capacity." After an eight-day jury trial, Fisher filed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), but the court denied the motion.

The court instructed the jury that "[i]t already has been conclusively established that if you find that the Defendants unlawfully arrested Steven Fisher, such arrest was done pur-

suant to the official policy of the City of San Jose and, thus, that the City is liable for such arrest." The jury was further instructed that the arrest was lawful if "the officers ha[d] probable cause to believe a crime has been committed and exigent circumstances exist," and also that "[e]xigent circumstances are those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay an arrest until a warrant could be obtained." The court additionally instructed that a "seizure or arrest occurs when a police officer or officers, by means of physical force or show of authority, restrains [sic] the liberty of a citizen in such a way that a reasonable citizen reasonably would believe under the circumstances that he or she was not free to leave." Finally, the court instructed that "[w]hen a person emerges from his home only because of police coercion, it is constructive entry and is considered an arrest within the home." The jury was not fully instructed, however, about how to determine when *any* entry takes place, so as to gauge whether exigent circumstances existed at all of the pertinent times. Moreover, as we explain later, the jury was improperly instructed on the standard for identifying an arrest.

So instructed, the jury found for the defendants on all claims. Fisher then filed a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). The court denied the motion on all other grounds but granted it as to the warrantless arrest claim against the City.

In so ruling, the district court laid out its reasoning in some detail. Observing that "[t]he very circumstances under which Steven Fisher w[as] arrested negate any implication that there was any great exigency in arresting him without securing a warrant," the court ruled that, because "between 6:30 a.m. and the time Fisher was taken into custody at 2:35 p.m., no exigency existed[,] . . . Defendants . . . had ample opportunity and time to seek a warrant from a neutral and detached 'magistrate,' as they were required to do under law." The court expressed skepticism as to why, when "well over sixty offi-

cers [were] present at the Fisher's apartment complex," not one of them was able to seek and obtain a telephone warrant before Fisher submitted to arrest.

The court awarded one dollar in nominal damages to Fisher and injunctive relief ordering the City to train its officers "on what is required under the Fourth Amendment and the case law interpreting it lawfully to arrest a suspect in his or her home and on the procedures for obtaining warrants both in-person and on the telephone." The City now appeals, challenging only the court's constitutional determination regarding the failure to obtain a warrant.

## II.    Standard of Review

This appeal arises from the grant of a Rule 50(b) renewed motion for judgment as a matter of law. That Rule provides:

> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence [under Rule 50(a)], the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.

Fed. R. Civ. P. 50(b). It is thus Rule 50(a) that sets out the standard for granting Rule 50(b) motions — whether there is "legally sufficient evidentiary basis for a reasonable jury to find for that party on [an] issue," and, if not, whether "a claim or defense . . . cannot under the controlling law be maintained or defeated without a favorable finding on that issue." Fed. R. Civ. P. 50(a). "Sufficient evidence" is "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

This court reviews the district court's grant of a renewed motion for judgment as a matter of law de novo. *Id*. The dis-

trict court's "judgment is proper if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.*

Although the jury instructions did not fully and properly cover the question of when the pertinent entry and arrest occurred, Fisher did not object to the jury instructions. The City argues that he therefore cannot complain of the jury's verdict as if the instructions had been proper, but only on the ground that *on the instructions given*, no substantial evidence supported the verdict. That proposition is not illogical, but it is incorrect.

True, an "appellant may not challenge on review the correctness of instructions to which he took no exceptions or only general exception." *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 182 n.5 (9th Cir. 1989) (quoting *Coca Cola Bottling Co. of Black Hills v. Hubbard*, 203 F.2d 859, 862 (8th Cir. 1953) and noting the Supreme Court's implicit adoption of this principle in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)). But that principle does not foreclose appellate review of an underlying legal question in the case through a Rule 50(b) motion. "[T]he failure to object to an instruction does not render the instruction the 'law of the case' for purposes of appellate review of the denial of a directed verdict or judgment notwithstanding the verdict." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 120 (1988) (plurality opinion) (quoting *City of Springfield v. Kibbe*, 480 U.S. 257, 264 (1987) (O'Connor, J., dissenting) (internal quotation marks omitted).[3] If a party moves under Rule 50 for judgment as a matter of law both before and after the verdict, as Fisher did, the motions are "sufficient to preserve the . . . issue for appeal, '[a]lthough the same legal issue

---

[3]Although *Praprotnik* was a plurality opinion, we have viewed the quoted principle as precedential, in light of a later Supreme Court case. *See Air-Sea Forwarders*, 880 F.2d at 183 & n.7.

was raised by both those motions and [by] the jury instruction." *Air-Sea Forwarders*, 880 F.2d at 183 (quoting *Praprotnik*, 485 U.S. at 120 (plurality opinion)) (first alteration in original). We may therefore review the question raised by Fisher — whether exigent circumstances existed such that a warrant could not have been obtained before the entry that effectuated the arrest or the arrest itself — even though the jury instructions did not fully and properly cover the key question — essential to deciding the exigency issue — of *when* an arrest or entry effectuating an arrest occurs.

## III.   Warrantless Arrest or Seizure

### A.   Arrest or Seizure Inside the Home and Exigent Circumstances

### 1.   The Warrant Requirement

**[1]** In general, police may not enter a person's home to arrest him without obtaining a warrant. *See Payton v. New York*, 445 U.S. 573, 589-90 (1980); *United States v. Prescott*, 581 F.2d 1343, 1350 (9th Cir. 1978).[4] Indeed, "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). It is because "the home is perhaps the most sacrosanct domain and . . . there, Fourth Amendment interests are at their strongest," *LaLonde v. County of Riverside*, 204

---

[4]Although the words of the Fourth Amendment are familiar, it is worth recalling them before embarking on an exegesis of the warrant requirement in the unusual circumstances here presented. The Fourth Amendment reads:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

F.3d 947, 954 (9th Cir. 2000), that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton*, 445 U.S. at 590. Police may, however, arrest a suspect in a public place without a warrant, assuming they have probable cause to believe that the suspect has committed a crime. *United States v. Watson*, 423 U.S. 411, 423-24 (1976).

**[2]** In determining whether an arrest occurs in-house or in a public place, "it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home." *United States v. Johnson*, 626 F.2d 753, 757 (9th Cir. 1980), *aff'd*, 457 U.S. 537 (1982). Applying that concept, if the police force a person out of his house to arrest him, the arrest is deemed to have taken place *inside* his home. *United States v. Al-Azzawy*, 784 F.2d 890, 892-93 (9th Cir. 1985); *United States v. Johnson*, 626 F.2d at 757. In *Al-Azzawy*, for example, the defendant "was in his trailer at the time he was surrounded by armed officers, and since he did not voluntarily expose himself to their view or control outside his trailer but only emerged under circumstances of extreme coercion, the arrest occurred while he was still inside his trailer." 784 F.2d at 893.

**[3]** Although it is possible to seize someone within the meaning of the Fourth Amendment in a manner that does not constitute a full-blown arrest, the same principles apply to any in-house seizure of a person, even one that does not amount to a full-blown arrest. Here is why: Although Fourth Amendment seizures that do not amount to arrests may be accomplished on less than probable cause, *Terry v. Ohio*, 392 U.S. 1, 20 (1968), we have held, in light of the special status of in-house seizures recognized in *Payton,* that "probable cause is a precondition for any warrantless entry to seize a person in his home." *LaLonde*, 204 F.3d at 954. Thus, whatever the nature of the seizure, the "less onerous requirements of *Terry*" — permitting seizure based on reasonable suspicion rather

than probable cause — cannot be applied to a warrantless entry to seize a person in his home. *Id*. For similar reasons, any in-house seizure must be subject to the warrant requirement as well, absent an applicable exception. We agree in this regard with *United States v. Saari*, in the Sixth Circuit, which reasoned as follows:

> [L]ike a full-blown arrest, an investigatory detention is a seizure that is subject to Fourth Amendment scrutiny. Thus, *Payton*'s holding that warrantless seizures of persons in their homes violate the Fourth Amendment, absent exigent circumstances, applies . . . regardless of whether the officers at issue were conducting an arrest or an investigatory detention.

272 F.3d 804, 809 (6th Cir. 2001) (citations omitted).

**[4]** It therefore does not matter for present purposes whether any seizure of Fisher that occurred before he was taken into custody at the conclusion of the standoff would have amounted to an arrest or to a *Terry* seizure had the seizure occurred outside the home. Either way, a warrant was presumptively required prior to entry.

## 2.  Exceptions to the Warrant Requirement

**[5]** The warrant requirement, however, is not without exceptions. The exception defendants rely upon here, and the one explicitly noted in *Payton*, permits arrests without a warrant inside a home when police officers have probable cause to believe that a crime has been committed[5] and exigent circumstances exist such that a warrant "could not have been obtained in time." *See United States v. Manfredi*, 722 F.2d 519, 522 (9th Cir. 1983). The standard has also been framed as permitting a warrantless arrest when "a substantial risk of

---

[5]Fisher concedes that probable cause to believe he committed a crime existed during the standoff.

harm to the persons involved or to the law enforcement process would arise if the police were to delay a search until a warrant could be obtained." *United States v. Robertson*, 606 F.2d 853, 859 (9th Cir. 1979); *see also Michigan v. Tyler*, 436 U.S. 499, 509 (1978) ("[A] warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant."). We read these enunciations of the standard to mean that a situation is exigent for purposes of permitting an arrest without a warrant if a warrant could not be obtained in time to effectuate the arrest *safely* — that is, for present purposes, without causing a delay dangerous to the officers or to members of the public.[6]

**[6]** Inherent in this standard are considerations regarding the time required, as a practical matter, to obtain a warrant. Where exigency is claimed, we have required "the government either to attempt, in good faith, to secure a warrant, or to present evidence explaining why a telephone warrant was unavailable or impractical." *United States v. Alvarez*, 810 F.2d 879, 883 (9th Cir. 1987) (footnote omitted). Here, none of the officers testified that there was any attempt to get a warrant at any point during the twelve-hour standoff, by telephone or otherwise. The City can therefore prevail only if it satisfactorily explains why a warrant was unavailable or impractical in the time available.

### 3.   Duration of the Warrant Requirement

The City's explanation on the key question of exigent circumstances proceeds from the premise that Fisher was under

---

[6]" '[E]xigent circumstances,' include the need to protect an officer or the public from danger, the need to avoid the imminent destruction of evidence, when entry in 'hot pursuit' is necessary to prevent a criminal suspect's escape, and to respond to fires or other emergencies." *United States v. Brooks*, 367 F.3d 1128, 1133 n.5 (9th Cir. 2004) (citations omitted), *cert. denied*, 543 U.S. 1058 (2005).

arrest by 6:30 a.m. at the latest, so the showing with regard to practicality of obtaining a warrant need only cover the period before then. The City cites *Al-Azzawy*, which held that because "the police had completely surrounded appellee's trailer with their weapons drawn and ordered him through a bullhorn to leave the trailer and drop to his knees . . . the arrest occurred while he was still inside his trailer." 784 F.2d at 893. *Al-Azzawy* also cited, with approval, a statement from a Sixth Circuit case that the defendant "was placed under arrest, without the issuance of a warrant, at the moment the police encircled [his] residence." *Id.* at 892 (quoting *United States v. Morgan*, 743 F.2d 1158, 1164 (6th Cir. 1984)). The City's thesis is that because under *Al-Azzawy* Fisher was arrested in his home and because the police had staked out Fisher's apartment and begun encouraging him to leave his apartment by 6:30 a.m, he was arrested by then, and the time after 6:30 a.m. is irrelevant to the question of whether it was possible to get a warrant.[7]

---

[7]Even if we were to assume the City's timeline as well as its understanding that only one, early arrest occurred, it is far from clear that sufficient evidence of exigency existed to justify the failure to obtain a warrant. Warrants need not always be obtained in person. Federal Rule of Criminal Procedure 41(d)(3), for example, allows a magistrate to issue a warrant by telephone if the police comply with certain procedures. The officers testified to knowledge of these types of procedures. Also, all officers who were questioned testified that judges are available twenty-four hours a day to issue warrants. The incident with the security officer occurred around midnight, Fisher allegedly pointed guns at the police officers from his apartment beginning around 2:45 a.m., and the asserted criminal threat to Males took place before 4 a.m. Although it was these events that, according to the parties, gave rise to probable cause for the arrest, the government has provided no explanation beyond a general claim of exigency as to why none of the police present tried to get a warrant for Fisher's arrest during that early morning period, directly or by contacting police headquarters and asking someone else to do it. *See United States v. Licata*, 761 F.2d 537, 543 (9th Cir. 1985) ("The exigencies must be viewed from the totality of circumstances known to the officers at the time of the warrantless intrusion."); *see also United States v. Lindsey*, 877 F.2d 777, 782 (9th Cir. 1989) (holding that exigent circumstances exception was satisfied where the police on the scene did not begin the warrant process during the one hour they were waiting for assistance from reinforcement dealing with a potentially dangerous situation because "the officers did not know in advance that the reinforcements would be delayed").

The pivotal problem with this reasoning is the City's unstated premise — that there could be only *one* arrest giving rise to the need for a warrant. After examining *Al-Azzawy,* post-*Al-Azzawy* Supreme Court case law, as well as the *Payton* line of cases, we conclude that this assumption is incorrect. The City's articulated thesis — that the warrant requirement necessarily lapsed even though the standoff continued — is therefore incorrect as well.

We conclude, instead, that the Fourth Amendment's warrant requirement for entering a home to seize or arrest someone does not disappear once there has been a single entry, seizure, or arrest, but continues in effect if there are further entries for the purpose of seizure or arrest — subject to an exception if there is an exigency excusing the warrant *at the time of the later entries.*

**[7]** Our analysis proceeds, first, from post-*Al-Azzawy* Supreme Court case law that indicates that there can be more than one seizure or arrest arising from a particular set of circumstances. *See California v. Hodari D.*, 499 U.S. 621 (1991). *Hodari D.* concerned a young man who fled at the sight of police and, while he was being pursued, threw aside a block of crack cocaine; the police thereafter retrieved the cocaine and charged Hodari D. in a juvenile proceeding. Until Hodari D. threw the cocaine, he argued, the officers did not have even reasonable suspicion to stop and question him. The question therefore was when Hodari D. was seized — before or after he tossed the cocaine.

**[8]** *Hodari D.* determined that, in general, while a seizure can be accomplished by "mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee," there is no "*continuing* arrest during the period of fugitivity." *Id.* at 624-25.[8] Thus,

---

[8]In *Hodari D.*, the encounter was in a public place, not in a dwelling, so no warrant requirement was applicable even if an arrest occurred. *See*

*Hodari D.* explained, if an officer places his hands upon a suspect intending to arrest him but the suspect flees, any arrest effectuated by the touching does not continue after the separation of the two. *Id.* at 625. The necessary corollary of this analysis is that a suspect once seized by the application of physical force but not subdued can be seized again, until he does yield to the officers. A further implication, which we adopt as a holding, is that the warrant requirement, if otherwise applicable, applies to later arrests or seizures even if there was an earlier, unsuccessful arrest or seizure as to which no warrant requirement was applicable. So, for example, if *Hodari D.* had succeeded in evading the police after they apprehended him on the street and the officers later came to his house to rearrest him, they would need a warrant to enter his house unless there was probable cause and an exigency *at that time* excusing the warrant requirement.

[9] The second strand in our Fourth Amendment analysis, derived from *Payton,* is the principle that "the critical time for determining whether any exigency exists is the moment the officer makes the warrantless *entry.*" *United States v. Johnson*, 256 F.3d 895, 907 (9th Cir. 2001) (en banc) (emphasis added). As explained in the Second Circuit's opinion upon which *Payton* relied as "persuasive":

> To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion

---

*Watson*, 423 U.S. at 423-24. Also, the technical issue in *Hodari D.* was whether there was a seizure, not an arrest. *See* 499 U.S. at 623.

Despite these distinctions, *Hodari D.* is applicable here, for two reasons. First, *Hodari D.* relied heavily on the law of arrest, both common law and constitutional, emphasizing that "an arrest [is] the quintessential 'seizure of the person' under our Fourth Amendment jurisprudence." *Id.* at 624. Here, we assume, as *Hodari D.* did, that common law of arrest concepts apply to seizure of persons that may not meet modern definitions of arrest, as well as to full-blown arrests. Second, as we have explained, a warrant is required for in-home seizures short of arrests, as well as for in-home full-blown arrests, as long as no exception to the warrant requirement applies.

> of the sanctity of the home. This is simply too sub-stantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present.

*United States v. Reed*, 572 F.2d 412, 423 (2d Cir. 1978) (quoted with approval in *Payton*, 445 U.S. at 588-89). Under this standard, it is the entry, not the arrest, that most directly triggers the constitutional concern. Indeed, as the facts of *Payton* itself illustrate, a warrantless entry made for purposes of arrest or seizure is constitutionally invalid even if no arrest ensues because the suspect is not there. *See* 445 U.S. at 576-77.

In sum: (1) there can be more than one arrest or seizure and therefore more than one entry for the purpose of effecting an arrest or seizure; and (2) the pertinent time for determining whether an exigency exists that excuses the need for a warrant to make an in-house arrest or seizure is the time entry is made to effectuate that arrest or seizure. Given these two principles, it does not matter whether the City is correct that the warrant requirement became operative during the early morning hours but was excused at the point because there was exigency. Assuming that much is true — which we do not decide — the warrant requirement did not *terminate* at that point, because (1) there were, after 6:30 a.m., discrete entries for the purpose of effectuating Fisher's seizures and arrest that triggered the warrant requirement under *Payton*; and (2) there was no exigency at the time of one or more of those discrete entries.

## B.  **Seizures and Arrest of Fisher**

Fisher clearly succumbed to police coercion while still at home when he agreed to come out of his house and submit to formal arrest. As Fisher's final arrest thus occurred inside his home — a determination the City does not contest — a war-

rant was presumptively required to seize him prior to this arrest.

What is contested is the timing of that arrest, or of any other seizures. The City argues that Fisher's only arrest occurred by 6:30 a.m., after the police officers on the scene had surrounded Fisher's home, attempted to convince him to come outside to talk, and positioned a sharp shooter to observe his actions. This argument implicitly maintains that any pertinent entry occurred before then. Applying the principles already discussed to the evidence presented, we conclude that the City's position is not supported by legally sufficient evidence.

There are, in fact, at least three possible junctures at which an arrest or seizure of Fisher could have occurred: (1) before 6:30 a.m., when the police had surrounded his house and were asking him to emerge; (2) when the officers caused force to be applied to him by tossing in CS canisters; or (3) when, at the end of the standoff, Fisher submitted to the officers' show of authority. As we proceed to explain, assuming an arrest occurred at the first juncture, as the City posits, we conclude that seizures occurred at the second and third junctures as well. Our conclusion that seizures or arrests occurred at those two junctures derives from standards for determining when seizures occur that have their roots in *Hodari D.*

### 1.  Pre-6:30 a.m. seizure or arrest

The City suggests that Fisher was arrested when he was no longer "free to leave" — which, according to the City, was when his apartment was surrounded by police officers, that is, some time before 6:30 a.m. Although the trial court's instructions to the jury in this case so stated and many cases do rely on the "free to leave" standard as necessary to determine when a seizure, essential to an arrest, has occurred, *see*, *e.g.*, *Gilmore v. Gonzales*, 435 F.3d 1125, 1137-38 (9th Cir. 2006),

that phraseology is not the most useful one under the present circumstances.

The problem with the "free to leave" standard as applied to barricaded suspects is that it does not effectively measure the degree of intrusion on their liberty worked by the police actions. Here, for example, Fisher was quite clear that he *did not wish* to leave.

**[10]** The Supreme Court has enunciated in the context of investigatory stops on buses a slightly modified version of the "free to leave" test more useful here: A person's liberty is restrained to the point of seizure for Fourth Amendment purposes when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988) and citing *Hodari D.*, 499 U.S. at 628); *see also United States v. Jacobsen*, 466 U.S. 109, 113 n.5 (1984) (stating that "the 'seizure' of a person within the meaning of the Fourth Amendment [is] meaningful interference, however brief, with an individual's freedom of movement"); *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (quoting *Bostick*, 501 U.S. at 437). As this line of cases recognizes, in most encounters between police and the citizenry, we presume a person's desire in terminating the encounter to be leaving the scene. In some cases, however, the desire is to stay in place and go about one's business, and in those instances the determination of when a seizure or arrest has occurred focuses on interference with those autonomy interests.

**[11]** The circumstances here are of the latter variety: Fisher expressed his desire to go about his business at home.[9] He

---

[9]In discussing Fisher's circumstances, we do not hold, as the dissent suggests, Dissent at 508, that the *Bostick* test is a subjective one. Rather, we observe only that Fisher was similarly situated to the bus passenger in *Bostick*, whose "freedom of movement was restricted by [his desire to stay on the bus — ]a factor independent of police conduct." 501 U.S. at 436.

repeatedly asked the police to leave him alone, withdrawing from public sight for several hours and attempting to watch television. Any approach focusing on serious interference with Fisher's liberty interest under circumstances such as these must therefore be framed not as freedom to leave but freedom to "ignore the police presence and go about his business." *Bostick*, 501 U.S. at 437 (quoting *Chesternut*, 486 U.S. at 569) (internal quotation mark omitted).

**[12]** The officers made it clear that they did not wish Fisher to continue to stay alone in his apartment and do what he pleased, and demanded that he cease his chosen activities and come outside to talk to them. This demand was not merely verbal but included throwing rocks at his window, speaking to him through a bullhorn, turning off his power, tossing a throw phone through into his home, setting off a "flash-bang" device, and throwing CS gas canisters into his apartment. Given this barrage of police threats outside the home and intrusions of objects and materials into the apartment, a reasonable person certainly would have felt constricted in continuing his daily activities at home.

Nevertheless, the "free to leave" or "free to go about [one's] business" standard is not alone determinative in ascertaining when an arrest or seizure has occurred, the critical inquiry in this case.[10] *Hodari D.* held that a common law arrest or seizure of a person could be accomplished in two ways: "*either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." 499 U.S. at 626. The

---

[10]We emphasize that nothing in *Hodari D.* or in this discussion bears directly on when a suspect is in "custody," for non-Fourth Amendment purposes. For purposes of applying *Miranda v. Arizona*, 384 U.S. 436 (1966), for example, we use a five-part test for evaluating whether someone is in custody. *See United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001) (examining "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual").

Supreme Court has clarified that, contrary to the jury instructions in this case and to the views expressed by our dissenting colleague, the "free to leave" — or, in this instance, "free to go about [one's] business" — test is "a *necessary*, but not *sufficient*, condition for seizure — or, more precisely, for seizure effected through a 'show of authority.' " *Id.* at 628. Even if police officers' words to a fleeing suspect constituted a "show of authority," *Hodari D.* held, a suspect is not seized as long as he is not complying with the officers' "injunction." *Id.* at 629. Fisher did not so comply until well after 6:30 a.m.[11]

### 2. Seizures or arrests after 6:30 a.m.

Addressing both modes of seizure that *Hodari D.* recognized, we conclude that the evidence supports only one reasonable conclusion: that Fisher was seized, in both manners, during the afternoon hours, even if he was also seized by 6:30 a.m. as the City posits.

### a. *Use of Force*

[13] Under *Hodari D.*, the first method of effectuating a seizure is through the application of physical force. The force need not be significant and can count as effectuating an arrest even if inadequate to gain control of the suspect. "[M]ere grasping" or "la[ying] . . . hands upon" a suspect is, for example, sufficient even if inefficacious. *Id.* at 624-25.

---

[11]As we discuss later, *Hodari D.* also announced that seizure — including arrest — through application of physical force can occur even though the force is ineffective in restraining an individual's liberty. 499 U.S. at 624. Some cases have asserted that a show of force such as occurred here, when the officers surrounded Fisher's apartment and placed a police car on the apartment complex lawn, is tantamount to an application of physical force under *Hodari D. See Ewolski v. City of Brunswick*, 287 F.3d 492, 506 (6th Cir. 2002); *Sharrar v. Felsing*, 128 F.3d 810, 819 (3d Cir. 1997). We assume that is so. *See* note 13, *infra.* As a result, we do not contradict *Ewolski* or create the circuit split that the dissent envisions. Dissent at 510 n.5.

**[14]** Also, the force used need not involve a direct physical connection between the officer and the suspect. Rather, a Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement *through means intentionally applied*," even if indirectly. *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989). So, as in *Brower*, if the police intentionally set up a situation which will cause force to be applied to a suspect, such as establishing a roadblock or firing a gun, they have used force on the suspect. *See id.* at 598-99 (holding that a seizure occurs when a person is "stopped by the very instrumentality set in motion or put in place in order to achieve that result"); *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[A]pprehension by the use of deadly force is a seizure. . . .").

Applying these standards, we conclude that whether or not the show of official force that occurred before 6:30 a.m. can be considered equivalent to the application of physical force for purposes of effectuating a seizure, there was no basis in the evidence for the jury to conclude that any such seizure was the only one that occurred. Rather, Fisher continued to go about his business in his apartment.[12] His doing so was equivalent to the escape envisioned by *Hodari D.*: Like a fugitive who flees after application of physical force sufficient to constitute a seizure, as long as he remained in his apartment, Fisher was not under complete police control, despite attempts to bring him into such control. For that reason, Fisher remained subject to seizure or arrest — and related entries into his home — after the arrival of the MERGE team

---

[12]Fisher's location is critical to our conclusion. As *Bostick* recognized, "escape" or "freedom," which may generally require an explicit showing of physical flight, takes on a different meaning in a confined location, such as one's home, in which there are compelling reasons — unrelated to police action — for an individual to remain. 501 U.S. at 435-36. Contrary to the dissent's suggestion, however, we do not hold that merely disappearing from view constitutes an escape of the sort discussed in *Hodari D. See* Dissent at 511-12.

even if he had been seized earlier, just as would an individual shot by the police who continued to flee thereafter.

[15] After the MERGE team arrived, the officers threw several volleys of CS gas canisters into Fisher's house. The gas was intended to reach Fisher's orifices and interfere with his ability to function and did so. Intentionally exposing Fisher to toxic substances is an application of physical force for Fourth Amendment purposes. *See Headwaters Forest Def. v. County of Humboldt*, 240 F.3d 1185, 1198-1200 (9th Cir.), *vacated and remanded,* 534 U.S. 801 (2001), *aff'd on remand,* 276 F.3d 1125 (9th Cir. 2002); *LaLonde*, 204 F.3d at 960-61. Thus, after the MERGE team arrived and Boler and Ryan left at 7 a.m., the officers applied physical force to Fisher on more than one occasion, which, under *Hodari D.*, constituted seizing him on each such occasion.

### b. *Show of Authority*

Alternatively, the police arrested Fisher at the end of the standoff, when he ultimately submitted to their show of authority by agreeing while still in his house to be placed under arrest.

The City insists that *Al-Azzawy* controls this case, because it deemed an arrest to have occurred when the police encircled the suspect's dwelling, thereby showing authority. *Al-Azzawy*, 784 F.2d at 892-94. *Al-Azzawy* and the cases it relies upon concern people who emerged from their dwelling shortly after a show of authority by police, so that the submission by emerging occurred essentially at the same time as the initial show of authority.[13]

---

[13]In addition to its emphasis on the officers' show of authority, *Al-Azzawy* also refers to "the officers' show of force." 784 F.2d at 893. So *Al-Azzawy* can be read, alternatively, to assert that armed, intrusive police actions such as those used in that case and this one outside the suspect's house constitute an application of physical force even though no physical substance actually touches the suspect, as in *Brower*. The Sixth Circuit in *Ewolski* similarly held that there was an "application of physical force" when "the police surrounded the house and paraded an armored vehicle in front of the [suspect's] house." 287 F.3d at 506.

This case presents a contrasting set of circumstances: Fisher did not succumb to the show of authority until over twelve hours had passed after the first attempt to contact him, and after several intrusive techniques had been used in addition to the initial show of authority. Fisher therefore cannot be said to have *submitted* to the officers' show of authority until at least 2:13 p.m., when he began speaking to the police over the throw phone.

**[16]** As *Hodari D.* emphasizes, when a seizure is effectuated through a show of authority rather than through any sort of application of physical force, there is no seizure until there is a *submission* to authority by the suspect; *assertion* of authority alone by the police is not enough. 499 U.S. at 629. After *Hodari D.*, the officers' show of authority and the "location of the arrested person," *Johnson*, 626 F.2d at 757, at the time of that show of authority remain significant under the Fourth Amendment, but it is the suspect's actions in *response* to the show of authority that controls the timing of a seizure when the seizure is not accomplished through the use of physical force.

**[17]** Following *Hodari D.*, we conclude that there was no evidence establishing that Fisher was arrested *pursuant to the officers' show of authority* until he submitted to that show of authority by agreeing to emerge from his home and then doing so. Even after the MERGE team applied physical force by tossing in CS gas canisters, Fisher attempted to ignore the police, generally refusing to speak with them and declining to come out of his home. The rocks thrown at his window, the flash-bang device, and the bullhorn failed to convince him to leave. The police began sending CS gas canisters into his apartment at 1 p.m. After two rounds of CS gas canisters, approximately six volleys in total, caused glass to shatter into his face as well as making it hard for him to breathe and see, Fisher finally agreed to submit to police authority by leaving his house at 2:35 p.m. At that point, the jury could only reasonably conclude, Fisher was seized — indeed, arrested —

even though he had *also* been seized earlier through the application of physical force that failed to bring him within complete police control.

## C. **Entries to Effect Fisher's Seizure or Arrest After 6:30 a.m.**

Our holdings that Fisher was seized both when he was physically affected by the CS gas canisters tossed into his home and when he submitted to the officers' show of authority by agreeing at the end of the standoff to accede to police demands to come out of his home are not, however, the end of our inquiry.

As described above, under *Payton*, the warrant requirement is triggered by the officers' entry into the home for the purpose of seizing someone rather than by the seizure itself, so the timing of entry for purposes of effectuating an arrest or seizure is what matters. *Payton*'s focus on the entry into the home as the critical constitutional factor leads to two other corollary principles central to this case: First, as this circuit and the only other one to address the question squarely have held, the *Payton* warrant requirement applies to situations in which officers force a suspect out of his home to arrest him, because "[o]therwise, arresting officers could avoid illegal 'entry' into a home simply by remaining outside the doorway and controlling the movements of suspects within through the use of weapons that greatly extend the 'reach' of the arresting officers." *Johnson*, 626 F.2d at 757; *accord Morgan*, 743 F.2d at 1164. Consequently, in a standoff situation such as this one, any seizure takes place *inside* the home for *Payton* purposes as opposed to outside of it, because the police officers, through their coercive action, constructively enter into a person's home and force him outside, to be taken into custody. *See Al-Azzawy*, 784 F.2d at 893 & n.1 (holding that "*Payton* [is] applicable . . . because . . . surrounding the house and ordering the suspect out [is] a 'constructive entry,' and

because the suspect emerged from the house only because of police coercion"); *Morgan*, 743 F.2d at 1164.

Second, even if exigent circumstances existed at the time officers make an *initial* warrantless entry, such an entry does not excuse the officers from the warrant requirement if the arrest happens after a *second*, discrete entry and the exigency dissipates before then. *Cf. United States v. Hackett*, 638 F.2d 1179, 1185-86 (9th Cir. 1980) (considering whether the exigency had dissipated between the warrantless entry into the suspect's garage and the warrantless entry into the suspect's house). Just as, under our understanding of *Hodari D.* the warrant requirement remains applicable to later seizures after an unsuccessful one, absent exigency, an entry pursuant to a warrant exception does not excuse all further warrantless entries for purposes of effectuating an arrest.

**[18]** Putting these principles together, we hold that the *Payton* in-house warrant requirement in a standoff situation is triggered each time police take an action that (1) either itself constitutes a seizure or is designed to force a suspect from his home to submit to police authority; and (2) is sufficient to constitute an entry. Here, the officers coercively intruded into Fisher's apartment in an effort to force him to emerge after 6:30 a.m., and before he finally did emerge at 2:35 p.m. During that period, the police used CS gas, bullhorns, a flash-bang device, and a throw phone with an open microphone to prod him. Tossing in the CS gas was itself a seizure of Fisher at home, as we have already explained, and therefore necessarily an entry, and lobbing in the throw phone, with its open microphone, was also an entry. *See Kyllo v. U.S.,* 533 U.S. 27 (2001) (comparing sense-enhancing technology used to obtain information about a home's interior to physical intrusion for Fourth Amendment purposes); *Silverman*, 365 U.S. at 509-11 (holding that it was a physical intrusion to extend a micro-

phone into a house). Thus, each action triggered the warrant requirement.[14]

For each of these intrusions sufficient to trigger *Payton*, the officers were required to have a warrant or establish circumstances excusing the warrant requirement. As the officers in this case never obtained a warrant, the City must demonstrate that, at the time of each entry, exigent circumstances existed such that a warrant could not have safely been obtained prior to the entry.[15]

In sum, at least some of the tactics the MERGE team used after it arrived were sufficiently coercive and intrusive to constitute entries into Fisher's home for the purpose of effectuating an arrest. Some of these tactics, indeed, involved actual, physical intrusion into Fisher's home, and may be best regarded as actual rather than constructive entries. Absent exigency, a warrant was required before those actions were taken.[16]

---

[14]We need not decide whether other actions, not involving physical objects thrown into Fisher's apartment, constituted entries under *Al-Azzawy*.

[15]As noted earlier, *Alvarez* tolled the period of exigency during the officers' attempts to obtain a warrant, as warrants cannot be obtained instantaneously. 810 F.2d at 883 (holding that "the government either . . . *attempt*, in good faith, to secure a warrant, or . . . present evidence explaining why a telephone warrant was unavailable or impractical" (emphasis added)). Thus, we are not commanding that officers leave the scene of a standoff once the exigency has disappeared. Instead, we require only that they begin to attempt to obtain a warrant when that attempt becomes feasible, given all the circumstances, while continuing in the meantime their efforts to maintain the peace and bring the suspect under control.

[16]We do not mean to suggest that more than one arrest warrant was required. *Cf. Carlson v. Landon,* 342 U.S. 524, 546-47 (1952) (even once an arrest warrant is fully executed, rearrest may be possible without a new warrant, especially in cases when the detainee has escaped); *United States v. Martin,* 399 F.3d 879, 881 (7th Cir. 2005) ("The fourth amendment's rules for warrants do not include time limits."). Rather, our point is that there were police activities taken *after* 6:30 a.m. for which one arrest warrant could have been obtained without a dangerous delay and was required.

### D. **Exigency at the Time of the Entries**

The pivotal question, consequently, becomes whether any or all of the entries for the purpose of arresting or seizing Fisher occurred at a time when any exigency had passed — that is, when it would have been possible to attempt to obtain a warrant without causing a dangerous delay. We conclude that there was insufficient evidence of such exigency for some time before the first CS gas canisters were thrown, so the failure to obtain a warrant before then is not excusable.

We have used a nonexhaustive list of criteria first enunciated in *Dorman v. United States*, 435 F.2d 385, 392-93 (D.C. Cir. 1970) (en banc), to determine whether circumstances meet the dangerousness prong of the exigency requirement. *See United States v. Blake*, 632 F.2d 731, 733 (9th Cir. 1980).[17] Those criteria are: (1) that a grave offense is involved; (2) that the suspect is reasonably believed to be armed; (3) there exists a clear showing of probable cause; (4) that there is a strong reason to believe the suspect is in the premises; (5) that there is a likelihood that the suspect will escape; and (6) that peaceable entry is made onto the premises. *See Dorman*, 435 F.2d at 392-93. Here, the *Dorman* factors suggest no clear result: Fisher was armed, he concedes probable cause, and he was definitely on the premises; *but* no grave offense was involved in this case, he was not likely to escape, and the entry was not peaceable.

The jury — which was not specifically instructed on the *Dorman* factors, but had before it evidence concerning each of them — must have determined that sufficiently dangerous circumstances existed at some point, as it found that the arrest was not unlawful. Such a determination is reasonable. Viewing the evidence in the light most favorable to the City, the officers were certainly justified in considering Fisher a danger

---

[17]*Dorman* explicitly noted that the list of considerations was not comprehensive. 435 F.2d at 392.

both to themselves and to the public. He was intoxicated, rambling about his Second Amendment rights, carrying a rifle and sometimes pointing it at police officers, tinkering repeatedly with seventeen more rifles, and making threatening comments. He was certainly not a man who could be counted on to remain peaceful. That is true after 6:30 a.m. as well as before.

Exigency, however, requires more than the dangerous circumstances that *Dorman* contemplates. *See United States v. Good*, 780 F.2d 773, 775 (9th Cir. 1986) ("Exigent circumstances alone, however, are insufficient as the government must also show that a warrant could not have been [safely] obtained in time.").[18] It is not determinative of the exigency issue that, as the City argues, Fisher "continued to present an imminent threat of danger to the officers and the community despite the fact that he had not been seen for a period of time." Although the degree of danger is directly related to whether a warrant could have been obtained — such that the more dangerous the circumstances, the less likely the police can safely obtain a warrant without compromising their peacekeeping duties — danger alone cannot justify a warrantless entry for the purpose of effectuating an arrest. Instead, we require that the "government [separately] demonstrate[ ] that a warrant could not have been obtained in time." *Manfredi*, 722 F.2d at 522.

Here, there is no such showing. The evidence undisputedly shows that there were enough officers working on Fisher's case, with enough time to obtain a warrant before the police sent the first of the CS gas canisters into Fisher's apartment.

Before 7 a.m., Fisher had been seen pointing a rifle at the officers, the action relied upon as providing probable cause

---

[18]Unlike *Good*, we use the term "exigent circumstances" to encompass both (a) the danger or other compelling need to enter, and (b) the inability to obtain a warrant in time.

for the later arrest. At least some of the officers who had observed the worst of Fisher's behavior left the scene at 7 a.m. and returned to the station house, where they or their colleagues could have initiated warrant proceedings. By 1 p.m., many officers had been at Fisher's apartment complex for several hours. There, too, officers could have initiated warrant proceedings by telephone. Such a warrant would have covered the entries effected in the afternoon and the seizures and final arrest thereafter.

[20] Unlike the one-hour delay in seizing a suspect's house that we considered in *Lindsey*, the delay the officers faced at Fisher's apartment complex was neither unexpected, caused by lack of additional assistance, nor, comparatively, short. *See* 877 F.2d at 782. Indeed, here there was considerably more time and more opportunity to obtain a warrant than there was in *Alvarez,* in which we concluded that the police should have sought a warrant.

In *Alvarez*, there was a potentially armed and dangerous drug dealer in a hotel room, whom police suspected was growing increasingly suspicious that his agents had not returned from a drug deal. We determined, however, that even in such serious circumstances, the officers could have attempted to obtain a telephonic warrant in the ninety minutes to two hours before the agents returned. *See* 810 F.2d at 881-83.

[21] We thus conclude that on the record before us, the only reasonable conclusion is that although the situation certainly remained dangerous, there was sufficient police presence and sufficient time after probable cause was established that an arrest warrant could have been obtained well before one or more of the entries that led to Fisher's seizure. Although our dissenting colleague maintains, quite sensibly, that the danger created by Fisher's action did not dissipate until he succumbed, she fails entirely to address the second prong of the inquiry — whether the police had enough time

and manpower to seek a warrant during the extended standoff and before one or more of the successive entries. Because there was such opportunity, the failure to obtain a warrant by early afternoon — before 1 p.m. at the very latest — was unconstitutional.[19]

## IV. Conclusion

Standoffs with barricaded suspects present hard decision-making problems for police, often requiring split-second tactical determinations. The results can be tragic even when the police behavior is for the most part quite reasonable. *See*, *e.g.*, *Ewolski*, 287 F.3d at 499 (involving the object of a standoff who shot himself and his son during the standoff). A warrant may not prevent such tragic occurrences. But interposing a neutral and detached magistrate between the police, who are "acting under the excitement that attends the capture of persons accused of crime," *United States v. Lefkowitz*, 285 U.S. 452, 464 (1932), and the citizen, who may or may not have committed a wrong, may, on occasion, bring a useful perspective to the situation. *Id.* ("[T]he informed and deliberate determinations of magistrates empowered to issue warrants as to what searches and seizures are permissible under the Constitution are to be preferred over the hurried action of officers and others who may happen to make arrests."); *see also John-*

---

[19]Contrary to the dissent's assertion, Dissent at 516-17 & n.9, we do not dispute the Sixth Circuit's conclusion in *Estate of Bing v. City of White-hall*, 456 F.3d 555 (6th Cir. 2006), that a danger to officers exists and continues throughout a standoff outside the home of an armed individual. Under our circuit's precedents, however, that is not the end of the inquiry. We must also consider whether the police could, as a practical matter, have obtained a warrant before effecting the final entry or entries. The very Ninth Circuit case upon which *Bing* relies in holding that dangerous circumstances supporting an exigency exception can continue for some time, *Lindsey*, so emphasized, stating: "A finding of exigent circumstances, however, does not end our inquiry. Since exigent circumstances imply that there is insufficient time to obtain a warrant, the government must show that a warrant, including a telephonic warrant, could not have been obtained in time." 877 F.2d at 782.

*son v. United States*, 333 U.S. 10, 14 (1948) (noting that the Fourth Amendment's "protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime"). The warrant requirement's goal is to permit a third party to evaluate whether the police should be intervening into a situation at all. If not, police retreat can prevent an awkward situation from escalating into a dangerous one.

Here, it may well be that a timely application to a magistrate would have resulted in issuance of a warrant for Fisher's arrest and events would then have proceeded pretty much as they did. But that is not certain, and is in any event beside the point. The criminal jury hung on the felony count presented to it, so it is at least possible that a magistrate would have thought the police lacked probable cause on the charge for which he was arrested. More importantly, it is precisely to require the officers involved to articulate the grounds for arrest and to obtain the views of a dispassionate magistrate on the adequacy of those grounds that a warrant is required.

Here, there were plenty of police officers involved and there was plenty of time — at least several hours — to obtain such a warrant. It was unconstitutional to fail to do so.

**AFFIRMED.**

---

CALLAHAN, Circuit Judge, dissenting:

I respectfully dissent.

What we have here is a very dangerous situation that was resolved safely for all concerned — Fisher, the public, and the police — because of good police work. Nevertheless, the majority undertakes to micro-manage, or worse, browbeat the

police for failing to obtain a telephonic warrant in the midst of a police standoff that could have turned deadly at any moment.[1] After reviewing all the facts and receiving proper instructions on the law, twelve jurors unanimously found that the police had handled the situation lawfully. We should accept the wisdom of the jurors' decision.

As judges, we should not arm-chair quarterback a crisis from the safety of our chambers. Such post-game analysis is disconnected from reality and leads to the inappropriate determination, in this case that San Jose police officers need training despite the jury's finding that they did nothing wrong. In my view, the police handled the situation in exemplary fashion and in full compliance with the law. I would reverse the district court's grant of Fisher's FRCP 50(b) motion and restore the jury's verdict because the verdict was supported by substantial evidence.

A renewed motion for judgment as a matter of law pursuant to FRCP 50(b) is properly granted "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Id.* Indeed, we may not substitute our view of the evidence for that of the jury. *Id.* The majority simply disregards this standard.

---

[1] Our precedents acknowledge that "[a] telephonic warrant may not be obtained simply by calling a magistrate. Among other things, a 'duplicate original warrant' must be prepared in writing and read to the magistrate verbatim." *United States v. Manfredi*, 722 F.2d 519, 523 (9th Cir. 1983). Furthermore, we have concluded that it is not "a simple procedure." *United States v. Good*, 780 F.2d 773, 775 (9th Cir.) *cert. denied*, 475 U.S. 1111 (1986).

In addition, the majority concludes that the San Jose Police Department seized Fisher for purposes of the Fourth Amendment at three "possible junctures": before 6:30 a.m., when they began surrounding his apartment; at approximately 1:00 p.m., when he was physically affected by the CS gas canisters, or alternatively at 2:35 p.m., when he submitted to the officers' show of authority by submitting to police demands to come out of his apartment. This confusing, impractical, and unworkable conclusion is based on an unreasonable interpretation of the Supreme Court's decision in *California v. Hodari D.*, 499 U.S. 621, 628-29 (1991) that requires a logical leap to decide that a person surrounded in his apartment "escapes" for the purposes of the Fourth Amendment by disappearing from view or ignoring the bullhorns, CS canisters, throw phones, and the armed officers surrounding his apartment.

## FACTS

The following facts emerge from the record. Fisher was drinking and cleaning 18 guns in his apartment. A security guard at his apartment complex called the police when Fisher's behavior became menacing. The police arrived shortly after midnight. Fisher was unresponsive for the most part, but insisted on talking about his Second Amendment rights. At approximately 3:00-4:00 a.m., Officer Jan Males, a tactical negotiator, arrived. Fisher told her that he had a right to bear arms. He also invited her into his apartment, but threatened to shoot her if she came in. Officer Males considered this to be a criminal threat — a felony.

Throughout the night, officers observed Fisher through the windows of his apartment walking around with a rifle in his hand, and more than once, aiming the rifle out of the apartment in the general direction of the officers. Officer Boler testified that he saw Fisher point one of his rifles toward Sergeant Ryan and Officer Males twice between 2:45 a.m. and 4:00 a.m., and that he was moving his rifles around his

apartment. At 6:23 a.m., Fisher was seen again with a rifle, apparently loading it.

At 7:00 a.m., the department's Mobile Emergency Response Group (MERGE) took control of the scene, and the officers who originally responded to the scene left. By 7:30 a.m., the police had evacuated all of the apartments in Fisher's building. One occupant, whose front door was near Fisher's residence, was evacuated by cutting a hole in her apartment wall that allowed her to leave through a neighboring apartment instead of walking across the front of Fisher's apartment. At 8:48 a.m., the police turned off the power in Fisher's apartment in an attempt to force him out. They also broke his sliding glass door and tossed in a "throw phone" so that they could communicate with Fisher because his phone line was busy. At 10:52 a.m., the police set off a "flash-bang" device to get Fisher's attention and briefly disorient him. At 1:00 p.m., police began throwing gas canisters into the apartment, to no avail. Finally, at 2:13 p.m., police established telephone contact with Fisher via the throw phone and he agreed to leave the apartment unarmed. The police then took him into custody.

## DISCUSSION

A warrantless search does not violate the Fourth Amendment where officers have probable cause to believe that a crime has been committed, and there are exigent circumstances such that a warrant could not have been obtained without causing a dangerous delay. *United States v. Manfredi*, 722 F.2d 519, 522 (9th Cir. 1983). Fisher concedes that officers had probable cause; the issue is whether exigent circumstances excused the City's failure to obtain a warrant before arresting him. This inquiry requires us to determine first, when the warrantless arrest occurred, and second, whether there were exigent circumstances at the time of the arrest to excuse the failure to obtain a warrant. Our consideration of these issues on their merits is complicated by the majority's

unnecessary, and in my opinion, incorrect analysis of the jury instructions.

## A.   Instructional Error.

"Failure to object to an instruction waives the right of review." *Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1196 (9th Cir. 2006). The Ninth Circuit does not review the adequacy of instructions given where the party does not object. *See Bird v. Lewis & Clark College*, 303 F.3d 1015, 1022-23 (9th Cir. 2002) ("As an initial matter, we note that Bird did not object to the instructions given by the district court. Accordingly, we do not review the adequacy of the instructions that were given.").

The majority acknowledges that Fisher failed to object to the jury instructions concerning the law of arrest, but nonetheless it proceeds to argue that the district court's jury instructions were incomplete and inadequate. Federal Rule of Civil Procedure 51 states that "no party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." The majority's insistence on considering, and criticizing the jury instructions is contrary to the Ninth Circuit's role as an "enforcer of Rule 51." *Hammer v. Gross*, 932 F.2d 842, 847 (9th Cir. 1991). By refusing to abide by the principle that, where a party fails to object to the instruction, this court must "review [a] sufficiency of the evidence claim under the controlling instruction," the majority threatens to undermine bedrock principles limiting the scope of our review of jury trials. *Image Tech. Serv. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) (refusing to consider argument concerning jury instruction the party waived by failing to object.).

The focus in this case should remain on whether the jury's verdict was supported by substantial evidence, discarding all evidence favorable to Fisher that the jury is not required to

believe, and drawing all reasonable inferences in favor of the City of San Jose - not on jury instructions that were not only correct and complete, but that Fisher failed to object to during the trial. *See Johnson v. Paradise Valley Unified School Dist.*, 251 F.3d 1222, 1227-28 (9th Cir. 2001) (stating standard of review where the district court grants a Rule 50 motion.).

## B. The Arrest.

The majority concludes that the warrantless seizure for purposes of arrest occurred either at 1:00 p.m., when the CS canisters were thrown into Fisher's apartment, or at 2:35 p.m., when Fisher came out of his apartment.[2] Citing *United States v. Al-Azzawy*, 784 F.2d 890 (9th Cir. 1985), the City argues that the arrest occurred much earlier under clearly exigent circumstances, when police first began using tactics to encourage Fisher to leave his home.[3]

The majority suggests that *Al-Azzawy* can be distinguished because in that case, the suspect emerged from his dwelling soon after a show of authority by police, whereas Fisher did not for several hours after police began attempts to force him out of his apartment. To the majority, this distinction is significant, because an arrest requires either physical force or submission to the assertion of authority. Citing *California v. Hodari D.*, 499 U.S. at 624-25, the majority concludes that Fisher was not arrested until he submitted to the police.

---

[2]The district court found only that the officers seized Fisher in his home during this encounter. Any contrary conclusions about when specifically the arrest occurred approaches improper appellate fact-finding, especially in light of our obligation to make all reasonable inferences in favor of the jury's verdict.

[3]*Al-Azzawy* held that because the defendant "was in his trailer at the time he was surrounded by armed officers, and since he did not voluntarily expose himself to their view or control outside his trailer, but only emerged under circumstances of extreme coercion, the arrest occurred while he was still inside his trailer." *Id.* at 893.

In *Hodari*, the issue was whether the defendant had been seized within the meaning of the Fourth Amendment at the time he dropped a brick of cocaine when he saw an officer running toward him. 499 U.S. at 623. Ultimately, the Supreme Court determined that there was no seizure under these facts. Nevertheless, the Court made clear:

> "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

499 U.S. at 627-28, *quoting United States v. Mendenhall*, 446 U.S. 544, 554 (1980). *Hodari D.* does not require subjective submission to police authority for purposes of a Fourth Amendment seizure, as the majority suggests, nor is there any requirement that physical submission take place immediately following a show of authority by police. Instead, it stands for the unremarkable proposition that pursuit alone is an insufficient show of authority to constitute an arrest. *Hodari D.*, 499 U.S. at 629. More importantly, *Hodari D.* reiterated that the test for when someone is seized for the purposes of the Fourth Amendment is an objective one. Therefore, twelve jurors were presumably able to determine when "a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554.

*Al-Azzawy* and the cases cited therein make no mention of how much time passed between the police's show of authority and the physical submission of the defendant. *Al-Azzawy*, 784 F.2d at 891. Indeed, *Al-Azzawy* holds that an arrest occurs at the time that police make clear that the suspect is not free to leave his or her dwelling:

> [W]hether an arrest has occurred depends upon an objective, not subjective, evaluation of what a person innocent of a crime would have thought of the situa-

tion, given all of the factors involved. When an arrest has occurred depends in each case upon an evaluation of all the surrounding circumstances. Primary among these is a determination of whether or not the defendant was free to choose between terminating or continuing the encounter with the law enforcement officers. . . .

From a review of all of the circumstances surrounding the encounter between [the appellant] and the special agents, we find that appellant's arrest occurred as he stood within his home at the doorway of his home and was first confronted by the agents with their guns drawn. . . . It is extremely doubtful that [appellant] would have believed that he was free to leave at any time or to request the officers to leave after the initial encounter. A reasonable person, under those circumstances, would have thought he was under arrest.

*Al-Azzawy*, 784 F.2d at 892-893, citing *United States v. Johnson*, 626 F.2d 753, 755-56 (9th Cir. 1980), aff'd on other grounds, 457 U.S. 537 (1982). *See also United States v. Patterson*, 648 F.2d 625, 632 (9th Cir. 1981) (citation omitted) ("Whether an arrest has occurred 'depends on all of the surrounding circumstances, including the extent that freedom of movement is curtailed and the degree and type of force or authority used to effectuate the stop.' . . . The question is whether, under all of the circumstances, 'a reasonable person would conclude he was under arrest.' "). This is an objective standard. The question is whether a *reasonable person* would believe that he or she was free to leave under the circumstances. *Hodari D.*, 499 U.S. at 627-28; *Al-Azzawy*, 784 F.2d at 892-93.

As the majority acknowledges, this was the standard the district court used when it instructed the jury regarding the law of arrest. Nothing has changed the standard for arrest

between when we decided *Al-Azzawy* and today. The majority states as much by relying on the Supreme Court's definition that a person is seized when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' "[4] *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988) and citing *Hodari D.*, 499 U.S. at 628). Yet the majority now faults the district court for instructing the jury using language taken directly from *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968) and *Mendenhall*, 446 U.S. at 554. The majority states that the jury was improperly instructed on the standard for identifying an arrest, yet it fails to state what the new jury instruction regarding arrest should be, or suggest a new, more comprehensive jury instruction that would satisfy its new standard.

The majority appears to be announcing a new principle in Fourth Amendment law: that, in the context of barricaded suspects or armed standoffs, the standard for whether the suspect feels "free to leave" is no longer a reasonable person standard that a jury may decide, but a subjective standard based on the suspect's reaction to being surrounded by armed officers, and being told to lay down his 18 guns and exit his apartment. The majority finds it persuasive that "Fisher was quite clear that he *did not wish* to leave," and that Fisher expressed a desire to go about his business at home. Not only does the majority ignore the Supreme Court's repeated statements that the standard is an objective one that may be determined by the rea-

---

[4]The majority gives too much meaning to the phrase "go about his business" as used in *Bostick*. This language did not change the inquiry into a subjective one, but is simply a restatement of the objective standard for a detention that the Supreme Court used in *Mendenhall*. The Supreme Court explicitly discussed *Bostick* in *Hodari D.* and concluded that "*Mendenhall* establishes that the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari D.*, 499 U.S. at 628.

sonable people on a jury, but their position ignores the practical reality that armed standoffs and barricaded suspects often involve irrational, desperate, and decidedly unreasonable people.

The majority's misguided analysis of the facts concentrates on Fisher's state of mind and actions, ignoring the mountain of evidence before the jury about the MERGE team surrounding the apartment with sirens blaring, pointing guns at Fisher, telling Fisher to come out through a bullhorn, tossing in a throw phone, and using other means of informing Fisher that he was surrounded, and that he should surrender peacefully. Here, the MERGE arrived at around 7:00 a.m., evacuated the building at 7:30 a.m., and shut off Fisher's power at 8:48 a.m. A reasonable person could conclude that he or she was not free to choose between terminating or continuing the encounter with the law enforcement officers when MERGE arrived, but would be certain of it by the time the power was shut off. Construing the evidence in the light most favorable to the City, *Pavao*, 307 F.3d at 918, it would have been perfectly reasonable for the jury to conclude that the arrest occurred when the police surrounded Fisher's apartment. The twelve people on the jury could have, and in this case certainly did conclude that this behavior constituted the arrest. The majority points to no evidence that shows that this is an unreasonable interpretation of the facts under Supreme Court or our court's precedent, or that any other interpretation would have been compelled by any new or implied jury instructions.

## C. Escape.

After conceding that the jury could have found that the San Jose Police Department seized Fisher for the purposes of the Fourth Amendment before 6:30 a.m., the majority raised the question of whether or not he escaped for the purposes of the Fourth Amendment and concluded that he had. The majority reasons that Fisher "escaped" by disappearing from view and refusing to come out, and therefore, in order to seize Fisher

again, the officers had to secure an arrest warrant, or additional arrest warrants. Nothing in the Supreme Court's decision in *Hodari D.*, relied upon by the majority for this odd proposition, compels this result.

In *Hodari D.*, the Supreme Court discussed the narrow question whether a show of authority (pursuing the defendant) alone seizes the person. 499 U.S. at 625-26. The Supreme Court stated that an arrest requires "*either* physical force" or "*submission* to an assertion of authority." *Id.* at 626 (emphasis in original). Applying this principle to the facts, the Court concluded that no seizure occurs while the suspect is fleeing from a show of authority. *Id.* at 628-29.

*Hodari D.* concerned fleeing in public, on public streets, however, not a situation where a person is surrounded in their own home. *See id.* at 622-23 (discussing facts in the case — that Hodari D. began fleeing from the officers on sight, tossed an object later determined to be crack cocaine, and then the officer tackled Hodari D.). The majority's interpretation of *Hodari D.* to mean that Fisher escaped by remaining in his apartment contradicts the principle that a person is seized when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[5] *Mendenhall*, 446 U.S. at 554. Logically, the majority's conclusion overturns our jurisprudence holding that a person is seized in his or her home for the purposes of the Fourth Amendment when the officers make a show of

---

[5]The Sixth Circuit rejected this argument in *Ewolski v. City of Brunswick*, concluding that surrounding the house and parading an armored vehicle in front of the house were "an intentional application of physical force and show of authority made with the intent of acquiring physical control." 287 F.3d 492, 506 (6th Cir. 2002). The majority's interpretation of escape in the context of barricaded or surrounded suspects creates an unnecessary inter-circuit split of authority, without any compelling reason. *See Kelton Arms Condo. Ass'n v. Homestead Ins. Co.*, 346 F.3d 1190, 1192 (9th Cir. 2003) ("we decline to create a circuit split unless there is a compelling reason to do so.").

force sufficient to convey to a reasonable person that he is under arrest and not free to leave his home or dwelling. *See Al-Azzawy*, 784 F.2d at 893 (affirming the district court's filing that the suspect was arrested inside his residence where "the police had completely surrounded appellee's trailer with their weapons drawn and ordered him through a bullhorn to leave the trailer and drop to his knees.").

In my view, the better, more reasonable, interpretation of submission for the purposes of barricaded or surrounded suspects is that the person submits by remaining barricaded or remaining in the home. This interpretation is consistent with our own precedent in *Al-Azzawy* and the decisions in other circuits. *See Al-Azzawy*, 784 F.2d at 893; *Ewolski*, 287 F.3d at 506; *see also United States v. Maez*, 872 F.2d 1444, 1450 (10 Cir. 1989) (collecting cases.). The suspect in that situation has accepted that there is, in effect, only one peaceful outcome — his or her eventual surrender. Only if the suspect flees and successfully evades the police blockade by leaving the house or other building the police surrounded and eludes attempts to take them into physical custody, may the suspect be said to have escaped and an arrest warrant becomes necessary.

To say that a suspect escapes every time he or she retreats from public view even though the officers know that he or she is in the building and surrounded, creates an analytical nightmare for law enforcement agencies. For example, may a bank robbery suspect trapped in a bank "escape" under the majority's analysis by ducking behind the counter, requiring the police to obtain an arrest warrant to continue surrounding the building or before taking any further steps to resolve the situation?[6] Under the majority's analysis, does a person "escape"

---

[6]I would also refuse to impose a warrant requirement on efforts to utilize a "throw phone" to communicate with barricaded suspects. The cases cited by the majority, *Kyllo v. U.S.*, 533 U.S. 27 (2001) and *Silverman v. U.S.*, 365 U.S. 505 (1961) involved efforts to eavesdrop on suspects with-

every time he or she moves to another room out of view of the officers, or closes the drapes or blinds?

My interpretation complies with the Supreme Court's admonition that courts "consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). It also applies the same "common sense and ordinary human experience" that the jury presumably applied to the facts in this case. *Id.* Therefore, I conclude that Fisher was arrested when the officers surrounded his apartment and it became readily apparent to a reasonable person that he was not free to leave. This occurred some time around 6:30 a.m. on October 24. I also conclude that Fisher did not escape for the purposes of the Fourth Amendment, and that police officers involved in standoffs are not required to obtain an arrest warrant every time the subject disappears from view. Because Fisher conceded that the officers had probable cause to arrest him when they surrounded his apartment, the remaining issue is whether or not exigent circumstances continued between the seizure and when the officers took physical custody of Fisher. *See Kirk v. Louisiana*, 536 U.S. 635, 637-38 (2002) (requiring finding regarding exigent circumstances for complete analysis of a warrantless arrest and search.).

**D.    Exigent Circumstances.**

Exigent circumstances are "those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons,

_____

out their knowledge. In particular, in *Silverman*, the officers used a "spike mike" inserted into a heating duct from the neighboring building to listen in on conversations. *Silverman*, 365 U.S. at 506-07. With a throw phone, the intrusion is a good-faith effort to communicate with the barricaded suspect, who is plainly informed about the phone, and is free to toss the phone back to the officers.

the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement concerns." *United States v. Brooks*, 367 F.3d 1128, 1135 (9th Cir. 2004). "The exigencies must be viewed from the totality of circumstances known to the officers at the time of the warrantless intrusion." *United States v. Licata*, 761 F.2d 537, 543 (9th Cir. 1985). As the Supreme Court recognized in *Brigham City v. Stuart*, "[t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." ___ U.S. ___, 126 S. Ct. 1943, 1949 (2006). The majority acknowledges that the pertinent time to determine whether an exigency exists is at the time that the arrest is effectuated, but then proceeds to ignore that principle.

The district court granted Fisher's Rule 50(b) motion because it found that there were no exigent circumstances between 6:30 a.m. and 2:35 p.m. because Mr. Fisher was not seen during this time. As noted, the jury reasonably could have concluded that the arrest occurred when the MERGE team surrounded the apartment and Fisher became aware he was surrounded. Regardless, the majority presumes to substitute its own version of the evidence for the jury's determinations, and announces that the arrest did not occur until 1:00 p.m. or later. At that time, the majority concludes, there were no exigent circumstances and thus, the warrantless arrest was invalid. Alternatively, the majority suggests that even if the arrest occurred earlier, when police surrounded Fisher's apartment, "it is far from clear that sufficient exigency existed to explain the failure to obtain a warrant." I disagree, as did the jury.

The jury was instructed that "[e]xigent circumstances are those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay an arrest until a warrant could be obtained." Although the jury verdict form did not require the jury to make a separate finding on exigent circumstances, the

jury implicitly found sufficient exigency to excuse the warrantless arrest when it returned a defense verdict.

In an effort to undermine the jury's determination, the majority latches onto *Dorman v. United States*, 435 F.2d 385, 392-93 (D.C. Cir. 1970) (en banc), and concludes that because the *Dorman* factors do not compel one clear result as to whether there was sufficient exigency at the time of the arrest, the jury erred when it implicitly found sufficient exigency. *But see United States v. Snyder*, 852 F.2d 471, 473-74 (9th Cir. 1988) (finding acts incident to a valid arrest did not constitute additional arrests).

The majority's acknowledgment that the facts do not compel one clear result is an express concession that there is *not* only one reasonable conclusion that is contrary to the jury's verdict. Accordingly, judges are not at liberty to disturb the verdict. *Pavao*, 307 F.3d at 918. Moreover, the majority significantly understates the gravity of the circumstances. Officers observed, and were told by Fisher's wife, that Fisher was drinking heavily while cleaning some 18 guns and rifles. Indeed, Fisher admitted to drinking an entire twelve-pack of beer during the evening. Fisher moved the guns around his apartment throughout the night, pointed a rifle in the general direction of officers more than once, and on two occasions, aimed directly at two officers, one of whom he threatened to shoot if she accepted his invitation to enter his apartment. He was non-responsive to officers' efforts to speak with him, other than to ramble about his Second Amendment right to bear arms. Officers felt, and the jurors evidently agreed, that Fisher posed a threat to the safety and security of the public and the officers.

The majority also relies heavily on *United States v. Alvarez*, 810 F.2d 879, 883 (9th Cir. 1987) to support an argument that we require a good-faith effort to obtain a warrant in every case where the government claims exigent circumstances. *Alvarez* is factually distinguishable because the exigent cir-

cumstance claimed in *Alvarez* was that the police feared a suspect in another location might become suspicious if there was additional delay before delivery of a large amount of cocaine. *Id.* at 880. Furthermore, the holding in *Alvarez* was that exigent circumstances did not exist that could excuse the absence of, or failure to obtain, an arrest warrant. *See id.* at 881, 882 (reviewing "a conclusion of exigent circumstances" de novo and concluding that "[t]he agent's actions in this case were thus fundamentally inconsistent with any true exigency."). In this case, the brandishing of firearms accompanied by threats against the officers, Fisher's drinking, and Fisher's erratic behavior all created a real and immediate danger to the public and the officers.

The passage of dicta quoted by the majority does not support a requirement that law enforcement make a good-faith effort to seek a warrant every time they claim an exigent circumstance excuses the warrant.[7] *Id.* at 883. Rather, the quoted passage stands for the unremarkable proposition that the government must present sufficient evidence of exigent circumstances or some other justification for not obtaining a warrant if exigent circumstances do not exist.[8] *Id.*

---

[7]The full passage from *Alvarez* reads:

> The government argues that obtaining a telephone warrant is not an easy task, and it points to our decision in *United States v. Good*, 780 F.2d at 775. But our decision here does not invariably require the government to have a telephone warrant before it moves in on a dangerous suspect. It simply requires the government to attempt, in good faith, to secure a warrant or to present evidence explaining why a telephone warrant was unavailable or impractical.

810 F.2d at 883.

[8]Because, in my view, the majority announces a new warrant requirement for armed standoffs when exigent circumstances clearly exist and continue until the end of the standoff, the officers may have been entitled to qualified immunity.

The Sixth Circuit, in *Estate of Bing v. City of Whitehall*, analyzed a strikingly similar situation involving an armed standoff with an unstable, possibly intoxicated person and decided "that exigency did not terminate due to the passage of time or the police's actions." 456 F.3d 555, 565 (6th Cir. 2006). Specifically, the Sixth Circuit noted that, "[t]he passage of time did not terminate the exigency because the ticking of the clock did nothing to cut off Bing's access to his gun, or cure him of his willingness to fire it, or move to safety the people nearby who refused to evacuate."[9] *Id.* Noting that the police had to take time to gather intelligence, wait for backup, and execute their plan, the Sixth Circuit concluded that these acts "did not terminate the exigency." *Id.* Furthermore, the Sixth Circuit decided that "the gathering of information by police, even in the face of immediate danger, does not negate a dangerous exigency."[10] *Id.* at 566. In addition, the Sixth Circuit in *Estate of Bing* analyzed the use of alternative means — using pepper gas and a bag phone — for resolving the standoff, and found that they did not negate the exigency. *Id.* at 566-69.

The majority's decision creates a clear circuit split on how to analyze the exigent circumstances in an armed standoff,

---

[9]The Sixth Circuit, ironically, cited to this court's opinion in *United States v. Lindsey*, 877 F.2d 777, 782-83 (9th Cir. 1989), where we concluded that it was improper to evaluate exigent circumstances after the warrantless entry, and that a one-hour delay while officers waited for backup "did not dissipate the exigency." The majority and the district court's position that courts may analyze exigency after the seizure of a surrounded suspect, without evidence of any facts that negate the initial exigent circumstance, implicitly overrules *Lindsey*.

[10]As the Supreme Court has stated, "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden v. Hayden*, 387 U.S. 294, 298-99 (1967). We have also recognized this principle in the context of exigent circumstances. *See Ortiz-Sandoval v. Clarke*, 323 F.3d 1165, 1170 (9th Cir. 2003) (denying habeas corpus where delay by police for investigation did not negate exigent circumstances); *Bailey v. Newland*, 263 F.3d 1022, 1033 (9th Cir. 2001) (same).

because it cannot be reconciled with the Sixth Circuit's decision in *Estate of Bing*. If the Sixth Circuit can reasonably conclude that the exigency that created the need for officers to surround the home of an irrational, possibly intoxicated, armed gunman was not negated over the course of a five-hour standoff or the use of pepper gas and a bag phone, then why is it impossible for a jury to reasonably reach the same conclusion?

The twelve jurors in this case could have reasonably found that there was no evidence that sometime between 6:30 a.m. and 2:35 p.m., the officers knew that Fisher no longer had access to guns, was no longer irrational, or was no longer intoxicated. There is nothing in the record that affirmatively negates the exigency created by Fisher when he had 18 loaded firearms, threatened others, pointed his rifle at police, was intoxicated, and was acting irrationally. Under these circumstances, officers had ample grounds to be seriously concerned about their own safety as well as the safety of the public, particularly since the events took place in an apartment complex. Construing the evidence in the light most favorable to the City, as we are required to do, it cannot be said that the jury was unreasonable in concluding that there were exigent circumstances that justified the City's failure to obtain a warrant before arresting Fisher around 6:30 a.m., and that the exigent circumstances continued throughout the standoff.

Armed standoffs are fluid and dangerous situations that are stressful, tense, and require difficult decisions to resolve peacefully. Not all of them result in the peaceful surrender of the suspect. *See Ewolski*, 287 F.3d at 499-500 (mentally disturbed, armed, and dangerous father shot his son and himself.). At any time, a standoff can end, or it can explode into violence. Sometimes, hostages are involved. Imposing a requirement that officers must, at some arbitrary and undefined point in an armed standoff, seek an arrest warrant is contrary to our precedent concluding that exigency is established at the time of arrest and continues until negated by

some new act or fact. *See Lindsey*, 877 F.2d at 781-82 (concluding circumstances outside of the officers' control did not dissipate the exigency.). Furthermore, imposing additional warrant requirements on the use of pepper gas, throw phones, and alternatives to deadly force during armed standoffs would not serve the Fourth Amendment's purpose of preventing unreasonable searches and seizures, would create unnecessary confusion about the law, and may ultimately endanger the public, the police, and even the suspect.

## CONCLUSION

The jurors in this case reached a verdict that was not only sufficiently supported by the evidence, but entirely proper under Supreme Court and our own precedents. In addition, the jurors in this case reached an eminently reasonable conclusion — that the San Jose Police Department should be commended for handling this dangerous situation properly, and ultimately bringing about a peaceful resolution. The Sixth Circuit, analyzing similar facts, reached the same conclusion as the jury in *Estate of Bing*. Our own precedents in *Lindsey* and *Al-Azzawy* are in accord with the Sixth Circuit's decision. Making all inferences in favor of the verdict, the jury's conclusion was a reasonable interpretation of the facts, and supported by substantial evidence. Therefore, the district court should not have granted Fisher judgment notwithstanding the verdict.

For these reasons, I would reverse the district court's grant of Fisher's renewed motion for judgment as a matter of law and reinstate the jury's verdict.